228 So.2d 874 (1969)
Lawrence BYRD
v.
STATE of Mississippi.
No. 45559.
Supreme Court of Mississippi.
November 24, 1969.
*875 Sullivan & Sullivan, Hattiesburg, for appellant.
A.F. Summer, Atty. Gen., by Guy N. Rogers, Asst. Atty. Gen., Jackson, for appellee.
JONES, Justice:
Section 2006, Mississippi Code of 1942 Annotated (1956) defines the crime of arson first degree as follows:
Any person who wilfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any dwelling house, whether occupied, unoccupied or vacant, or any kitchen, shop, barn, stable or other outhouse that is parcel thereof, or belonging to or adjoining thereto, whether the property of himself or of another, shall be guilty of arson in the first degree, and upon conviction thereof, be sentenced to the penitentiary for not less than two nor more than twenty years.
Appellant was indicted under this section following the words of the section by using "or". In other words, the crime was charged in the disjunctive rather than the conjunctive. A demurrer was filed to the indictment, and the district attorney, with permission of the court, then amended by striking out the word "or" and writing in the place of it "and" so as to charge the various acts in the conjunctive.
A demurrer and a motion to quash was filed to the amended indictment on the ground that the original indictment was not amendable.
Section 2449 of the Mississippi Code of 1942 Annotated (1956) provides for the amendment of indictments in cases of formal defects. It will be noted that the amended indictment did not change the crime charged and did not add any new elements thereto. As stated in 42 C.J.S. Indictments and Informations § 240, page 1250 (1944):
The test of whether an accused is prejudiced by the amendment of an indictment *876 or information has been said to be whether or not a defense under the indictment or information as it originally stood would be equally available after the amendment is made and whether or not any evidence accused might have would be equally applicable to the indictment or information in the one form as in the other; if the answer is in the affirmative, the amendment is one of form and not of substance, * * *
This is the rule that has been adopted by our Court. Kelly v. State, 239 Miss. 683, 124 So.2d 840, 85 A.L.R.2d 1199 (1960); Gillespie v. State, 221 Miss. 116, 72 So.2d 245 (1954); Hearn v. State, 219 Miss. 412, 69 So.2d 223 (1954); Perciful v. Holley, 217 Miss. 203, 63 So.2d 817 (1953); Mays v. State, 216 Miss. 631, 63 So.2d 110 (1953); Osser v. State, 165 Miss. 680, 145 So. 754 (1932); Sauer v. State, 166 Miss. 507, 144 So. 225 (1932).
The case of Lenoir v. State, 237 Miss. 620, 115 So.2d 731 (1959) involved child desertion where the statute provided for various acts constituting desertion and non-support, the said various acts being connected by the disjunctive "or". The indictment charged a violation of Section 2087 by the use of the conjunctive word "and". A question was raised as to the indictment in that case, and the Court said:
It is a general rule that where a statute denounces as an offense two or more distinctive acts, things, or transactions enumerated therein in the disjunctive, the whole may be charged conjunctively and the defendant found guilty of either one. Section 1798, Vol. 4, Wharton's Criminal Law and Procedure; 27 Am. Jur., Indictment and Information, Sec. 104. This Court seems to have followed this general rule in cases involving other statutes. Cf. State v. Sam, 154 Miss. 14, 122 So. 101; Sauer v. State, 166 Miss. 507, 144 So. 225; Turner v. State, 177 Miss. 272, 171 So. 21; Brady v. State, 128 Miss. 575, 91 So. 277; State v. Clarke, 97 Miss. 806, 52 So. 691; Coleman v. State, 94 Miss. 860, 48 So. 181, and West v. State, Miss., 49 So.2d 271. 237 Miss. at 623-624, 115 So.2d at 732.
The court did not err on this ground.
The appellant moved that the State be required to elect the offense on which appellant would be tried, and also demurred to the amended indictment, both of which were overruled. A motion was made to quash the indictment. It was alleged that appellant was summoned before the grand jury and that he should be granted immunity under the constitutional clause providing against self-incrimination.
It was stipulated, however, that while the appellant was summoned before the grand jury, he answered in response to the first question propounded to him that he claimed his rights under the Fifth Amendment, and he was thereupon immediately excused. He did not testify to one fact. Consequently there is no error in refusing to quash the indictment because of his appearance before the grand jury.
It is argued that partiality was evident in the trial as a whole. This argument is without any substantial basis. The trial covered three full days and approximately one thousand pages of transcript. Complaints that the judge urged dispatch and gave his reasons sometimes for his ruling on objections and insisted on proceeding does not manifest any partiality. Such things occur in every case of any length, and we have found no evidence in this record that would justify our holding that impartiality was lacking. The above questions are raised by the appellant and are discussed here because, as to them, it is unnecessary to discuss the actual facts shown on the trial.
This is a companion case to that of Smith v. State, 223 So.2d 657 (Miss. 1969) and involved the burning of the residence of one Vernon Dahmer in which he and his family were sleeping; the burning being *877 done at midnight on January 10, 1966, near Hattiesburg, Mississippi. The Smith case, supra, will give an "overall picture" of the situation and the question here is whether the evidence was sufficient to connect appellant Byrd with the said offense. He was not actually present at the burning.
Two witnesses in this case testified that the appellant was present at two meetings of the Ku Klux Klan near Laurel, Mississippi. It was stated that one of these meetings was held on property belonging to Byrd, but there was a conflict as to this. At the first meeting, it was testified that Sam H. Bowers, the Imperial Wizard, spoke and was vehement in his condemnation of Vernon Dahmer and said that something had to be done about him. He wanted to burn him out or kill him, such acts being designated by Numbers 3 and 4. It was suggested that a "dry run" first be made by the property for reconnaissance purposes. Byrd said that he could not go because of back trouble he was having. The "dry run" was gone through and there was another meeting in another part of the county where the matter was further discussed, and Byrd was present. Although no one could testify as to what he said, witnesses did state that he made some remarks, but they could not understand them except for the statement about the condition of his back.
It is shown from one of the meetings that Byrd drove one of those who was to go on the run to that party's filling station in the filling station operator's car and then carried the car home with him where it was left with the keys in it, available to the owner who secured it the next morning before Byrd arose.
The Federal Bureau of Investigation obtained a statement from Byrd as to his connection with the matter, which statement consists of twenty-two typewritten pages. When the statement was objected to, a hearing was had by the judge out of the presence of the jury in which it was determined by the judge that the statement was given voluntarily and not as the result of any threats, force, or other wrongful inferences. The Court therefore overruled the objection to the statement and admitted it into evidence. Thereupon an objection was made to the introduction of the entire statement on the ground that there were statements therein that were inadmissible. The objection was likewise overruled. Because of the length of the statement, we only copy herein portions thereof. The man, Giles, mentioned in the statement, was shown by the evidence to be the owner of the car; the tires of which were shot and the car was abandoned on the side of the road.
* * *
I have been a member of the White Knights of the Ku Klux Klan of Mississippi (WKKKKOM) in Jones County, Mississippi, for approximately three years. I was Treasurer for the complete Jones County organization of the Klan for a period of time and then was appointed County Senator by Sam Bowers, Imperial Wizard, WKKKKOM.
* * *
In connection with the Dahmer burning which occurred on the early morning of January 10, 1966, I wish to furnish the following information:
Sam Bowers called a special meeting on a Thursday night either two or three weeks prior to the time Dahmer's house was burned. My first knowledge of this meeting was when Billy Moss, a service station attendant at Laurel and a fellow member of the WKKKKOM, came to my home this Thursday night and asked if I could get away to go with him to a meeting. I went with Moss in Moss' Chevrolet Corvair to the meeting place, which was held on Masonite land in the Bogue Homa Swamp northeast of Laurel, Mississippi, within a few miles of my farm.

* * * * * *
Bowers opened the meeting by relating that something had to be done about that Dahmer "nigger" in Forrest County, whom *878 he described as the "big NAACP nigger there." Bowers said the Forrest County Klan unit had not done anything about Dahmer, * * * Bowers said that he was going to take the Dahmer matter into his own hands and that Dahmer had to be stopped, and said, "I want good men who are willing to stop him."
* * * Nix assured the group that as the State Investigator for the Klan he had investigated the Dahmer matter and that Dahmer had to be done away with.
One of the members present, possibly Sessum, asked what was going to be done to Dahmer. Bowers replied, "That will be decided when the run is made." I interpreted this to mean they would make a dry run by Dahmer's place and at that time would decide what they were going to do.
Bowers then announced that all the men who wanted to go on the job were to immediately leave the meeting and proceed to J.I. McCarty's Texaco Service Station in Laurel, where they would rendezvous prior to going on the dry run. Bowers said that all the men on the dry run would go in two cars from McCarty's Service Station to the Dahmer residence. Bowers instructed that if anyone present did not intend to go on the job, he should not go on the dry run. I commented at the time that I could not go as I was sick and that my back was giving me trouble.
The meeting then broke up and I rode with Moss to McCarty's Service Station in Moss' car, where Moss got out to go on the run. The others who had been present at the meeting were there, and Deavours Nix's Thunderbird had the motor running, apparently ready to go on the dry run. I left the group and drove home in Moss' car. I left the car parked in my driveway with the keys in the ignition, and on arising the following morning, the car was gone. Since I had a prearranged agreement with Moss that I would leave the car parked there, I presumed he had picked it up at the conclusion of the dry run.
Three or four days after this special meeting, exact date not recalled, Sam Bowers came to my Radio and TV Shop in Laurel. He handed me two pieces of paper. Each piece was doubled over and had Scotch tape on it. On one was written Forrest and on the other was Jasper. Bowers said that one piece of paper was in reference to the Forrest County project and the other was concerning a Jasper County Negro who lives just south of Paulding Community. Bowers said he wanted each of these projects to be investigated by the Klavern.
On the following Sunday I called a county meeting which met near the fire tower south of Ike Farris' place on U.S. Highway 11. I told the group convened that the Imperial Wizard, meaning Bowers, had two projects which he wanted investigated. I showed the group the two folded papers concerning the Forrest and Jasper County projects which Bowers had given me, and I asked for volunteers. Present at this meeting were the following officials of the WKKKKOM.
Robert E. Rivers, Exalted Cyclops of Klavern Number 5;
Cecil Victor Sessum, Exalted Cyclops of Klavern Number 4;
Lawrence Byrd, County Senator;
An old man from Klavern Number 2, whose name I do not know but who I believe may be a Mr. Noble, the Exalted Cyclops of this Klavern;
(First name unknown) Parker, representing Klavern Number 1 at Sandersville, Mississippi;
Clifton or Clifford Wilson, County Investigator, who operated the Laurel Brace and Limb Company;
(First name unknown) Harper, representing Klavern Number 3, who works at Low Cost Form Company in Laurel;
(First name unknown) Knight, Exalted Cyclops of Klavern Number 3, who lives at Soso, Mississippi.
*879 After I asked for volunteers, Robert E. Rivers spoke up and said that he had men in his Klavern living in Jasper County, so he agreed to accept the Jasper County project and turn it over to his Investigator.
There followed a discussion as to whether the Dahmer project in Forrest County should be handled by Klavern Number 2 out of Ellisville or Klavern Number 4, the East Jones County group. Cecil Sessum spoke up and said, "I'll take it and turn it over to my Investigator." I do not know why Cecil decided to take the project, since he was actually in the East Jones County group and this was logically a project for the Ellisville group. It may have been because the old man present who was the Exalted Cyclops of the Ellisville group is old and has arthritis bad.
Shortly afterwards, the meeting adjourned and the group moved out.
The next I heard concerning the Dahmer matter was a newscast which I heard at my home at about 6:00 a.m., Monday, January 10, 1966, concerning the burning of Dahmer's home. After hearing this newscast, I left home in my pickup truck to go to my shop. While en route at about 7:20 a.m., at the intersection of 14th Street and North Third Avenue in Laurel, Henry DeBoxtel pulled up alongside my car on the left; with Howard Travis Giles riding with him. As I recall, they were in an old black dilapidated Buick car which is the property of either Henry DeBoxtel or his mother. They flagged me down and Giles got out of the car and stood alongside my truck. Giles said, "I'm in a hell of a shape. My car is in trouble down there in Forrest County with two flat tires. Somebody got my car and it's down near where that burning went on last night." I asked Giles why he could not go to Grady Chance's service station and get "nigger Pee Wee" to go and get the car and possibly consider putting tires on it where it would drive. He said he could not do that because they could still trace the car as belonging to him and commented that "The feds have got it covered up." We discussed what could be done and Giles commented that he had the key to the trunk and that he would try to get another wheel and use the spare from his truck to replace the two tires that were flat and get the car back.
Henry DeBoxtel said, "We'll have to call the law and report the car stolen." I told him that if the car was in a bad spot where they could not get to it, they should call the Laurel Police Department, and report it stolen. DeBoxtel reminded me that the car was in the county and that a stolen report would have to be made to the Jones County Sheriff's Office. DeBoxtel then said that he was taking Giles back to the Chow House, which is DeBoxtel's cafe in Laurel. * * *
On Tuesday or Wednesday, which would be January 11 or 12, 1966, Howard Travis Giles came to my shop and said "they" had pulled his car in and would not release it. Giles said he needed transportation and he wanted to know what could be done to get it for him. I suggested that he get a lawyer and see if he could not get the car by that means.
Giles later came back by my shop and told me that Sam Bowers, Deavours Nix, and "Red" Caldwell had arranged for Giles to get a car and did get him one. Caldwell is County Giant for the WKKKKOM. Three or four days later Giles came back by my shop in his truck. He said he was not satisfied with the car they got for him and that he did not ever want his old car back as he did not want his wife and kids to ever have to ride in this car again. Giles said he had gone to Hattiesburg with his lawyer but had been unsuccessful in recovering the car.
Following the Dahmer incident after it was common knowledge through the news that Giles' car had been impounded in Forrest County, Cecil Sessum came to my store and said that a collection should be taken up from the Klan members to buy Giles another car. Sessum said that if a man had to sacrifice his car and possibly his job and life on a Klan project, he was entitled *880 to have the car replaced. I told Sessum that this was a matter to be handled on a state level pointing out to him that I do not handle any money. By being handled on a state level, I referred to Sam Bowers as Imperial Wizard and Deavours Nix as State Investigator. During the course of this conversation I mentioned to Sessum having heard in the news that a jug containing gasoline had been found in Dahmer's truck and was being held as evidence. I expressed concern about this as well as the fact that there might be fingerprints on Giles' car. Sessum said the jugs had been wiped clean and that there was no problem there. He said that if any fingerprints were found on Giles' car they could just as easily have been prints put on there several days earlier. Sessum at this time expressed concern and made the statement, "One of my men dropped a pistol by that house. Let's hope that when the house burned, it burned the pistol beyond recognition." I told Sessum that fires do not burn serial numbers and that the pistol could still be identified. Sessum then said that if this were the case, he hoped that in the confusion after the fire some "nigger" may have seen the pistol and put it in his pocket without reporting it.
On Monday night, January 10, 1966, Cecil Sessum picked me up at my house in Laurel in his, Sessum's, 1965 blue Comet automobile to go to a county meeting of the WKKKKOM. "Red" Caldwell was in the car with Sessum and I got into the back seat. Sessum drove out Fifth Avenue and then to the Boy Scout camping area west of Sandersville, Mississippi. Present at this meeting were the following individuals:
Cecil Sessum, Exalted Cyclops, Klavern Number 4;
"Red" Caldwell, County Giant;
Lawrence Byrd, County Senator;
Tom Landrum, representing Klavern Number 1;
Clifton or Clifford Wilson, representing Klavern Number 5;
(First name unknown) Jernigan of Klavern Number 2, who sells meat for a packing company at Petal, Mississippi.
The only car present in addition to Sessum's Comet was Jernigan's car, description unrecalled. It was very cold, and I got outside Sessum's Comet temporarily at which time I thought I heard a limb break nearby in the woods. I mentioned this to Caldwell, who told me he heard the same thing but hesitated to mention it for fear that the group would think he was "running scared." I got back in the Comet with Sessum and Caldwell at which time Sessum mentioned that the Dahmer "nigger" had died that day. Sessum was very nervous and upset and rested his head between his arms on the steering wheel of the car. Caldwell punched Sessum and asked if he was all right. Sessum, who was shaking, said he was shook but that he would be all right. Sessum at this time related that he was afraid one of his own men had shot one of the cars involved in the Dahmer Burning. Sessum said that Giles had not left the trunk key in his car and that, therefore, the men in the car could not get to the spare tire when the tires were shot out. I commented to Sessum and Caldwell that the way things turned out that I was being pushed around, that Bowers and Nix were bypassing us on these projects but that I would just have to take the blame for the Dahmer matter. By taking the blame for the Dahmer matter I meant that rightfully it was my job to pass on projects of this type and that although I had been bypassed, I nevertheless was willing to share in the responsibility.
At this time the two cars moved from the first spot in the Boy Scout area and traveled approximately six miles with Jernigan's car following Sessum's Comet. We all got out of our cars and someone in the group mentioned that Dahmer had died. I believe "Red" Caldwell remarked that the "nigger," meaning Dahmer, had gotten too big and was very possibly given a shot and killed in the hospital in order to get the Feds to investigate the matter. As I recall, *881 there was no further comment concerning the Dahmer matter and the group broke up shortly as it was extremely cold.
I wish to state that for the next several days, Cecil Sessum came to my shop continuously inquiring whether I had heard anything about the progress into the Dahmer investigation. I wish to state that in the recent past since the Dahmer burning, but exact date not recalled, in the course of a conversation when Cecil Sessum was in my shop, I told Cecil that it appeared that the FBI was making inquiries concerning a white Buick with a whip antenna as possibly being the second car involved in this matter. Sessum commented, "That shows how far off they are. The car wasn't a Buick. It was a white Chevrolet."
I attended a county meeting of the WKKKKOM for Jones County on Friday night, February 11, 1966, which was held in a vacant house on my farm northeast of Laurel, Mississippi. This meeting was attended by the following persons:
Lawrence Byrd, County Senator;
Sam Bowers, Imperial Wizard;
Robert E. Rivers, Exalted Cyclops, Klavern Number 5;
Aaron Jernigan, representing Klavern Number 2;
Cecil Victor Sessum, Exalted Cyclops, Klavern Number 4;
"Red" Caldwell, County Giant;
Deavours Nix, State Investigator;
Billy Ray Smith, representing Klavern Number 5, who works at the Laurel
Brace and Limb Shop;
Name unknown, a black-headed boy who travels with Aaron Jernigan and works as a meat cutter at the same meat company as Jernigan at Petal, Mississippi.
I believe that either Ray Speed Lightsey or Tom Landrum was present representing Klavern Number 1, although I am not positive.
This meeting was opened with prayer by Sessum at the request of "Red" Caldwell. Afterwards, Caldwell announced that there were some distinguished guests, identifying Imperial Wizard Bowers, who thereafter talked about 45 minutes on his recent trip to Washington, D.C., and appearance before the House Committee on Un-American Activities (HCUA). These remarks were followed by Deavours Nix, who spoke approximately 15 minutes concerning his appearance before this committee. After this there was a discussion concerning finances, specifically concerning payment for a motor in Robert Rivers' Volkswagen which motor was burned out by Bowers and Nix, who had borrowed Rivers' car to attend a state meeting in Jackson. Bowers agreed to take up this expense at a meeting of state officers after it was voted unanimously that the state organization reimburse Rivers for the expense of the motor. There followed a discussion of legal fees for Pete Martin in connection with his arrest for shooting into the home of Dr. Murph. This legal fee was in the amount of $500.00. Bowers said this fee was too high and commented that Attorney Charles Blackwell of Laurel had represented all of the Klan officials from Mississippi before the HCUA hearings, for $500.00. I told the group that I thought the fee should be payed to the lawyer.
I do not recall any discussion on the floor at this meeting concerning the Dahmer incident. After the meeting was dismissed Deavours Nix told me aside from the group that he wanted to set up an arrangement to take care of squealers, and he wanted to use Numbers 12, 13, and 43 for this purpose. My number is 12. I do not know who is Number 43 but do know no individual has been assigned Number 13. Nix later told me he was in error in referring to Number 13 explaining that he intended to use Number 17, which is the number of B.F. Hinton in Klavern Number 1.
I do recall that in the course of this meeting the question of FBI informants *882 was mentioned, and "Red" Caldwell said that if anybody said three words to the FBI, it would be two words too many.
I recall that two or three days prior to this meeting of February 11, 1966, Cecil Sessum was at my shop and we discussed the fact that someone must be talking. I asked Sessum if he thought it were possible that Billy Moss had talked too much. Sessum said, "It is not Moss as I would not go to prayer meeting with him." I then asked Sessum whether he thought Lamar "Shorty" Lowe may have talked and Sessum replied, "He is in Texas and God knows what he has told." At this point our conversation was terminated on this occasion.
Cecil Sessum came to my shop at Laurel late Monday afternoon, February 21, 1966. Sessum and I sat in my station wagon parked outside the shop. I told Sessum I was gravely concerned over the fact that somebody apparently was talking about the Dahmer burning and that as County Senator of the White Knights, I was obligated to conduct an investigation to determine who was talking. Sessum agreed that somebody must be talking and stated he likewise was concerned. Sessum asked whether in my opinion an informant should be eliminated if identified. I told Sessum that I had never advocated elimination of anyone but that the informant would have to be lectured, brought to trial, and sworn out of the Klan. I told Sessum this was another reason why I did not feel it advisable to have this matter investigated by state officials inasmuch as these officials undoubtedly would want to eliminate the informer.
I told Sessum I had decided to appoint a committee of three trusted members of the White Knights none of whom would be known to the other investigators. I told Sessum that in order to conduct an effective investigation it was necessary that I be furnished with complete details concerning the Dahmer matter.
Sessum asked me whom I intended to appoint to the committee; I told him I had already appointed one man and Sessum asked the identity of this man. I declined to tell Sessum at which time he asked if he could recommend one member of the investigating committee. I told him he could feel free to recommend a man but assured him even if the man he recommended were named to the committee that Sessum would not know his identity. Sessum then stated that he would like to recommend Henry DeBoxtel as a member of the committee. I told Sessum I was not in favor of DeBoxtel pointing out it was common knowledge that Henry DeBoxtel, Travis Giles, and E.J. Ishee were all dating Mary Lyons at the same time and that this triangle could result in drinking and shooting. I also told Sessum that this relationship with the Lyons woman could influence DeBoxtel's judgment in conducting an investigation. Sessum agreed that this might be true and that under these circumstances it might not be wise to name DeBoxtel to the committee.
Sessum told me that on the night of the special meeting prior to the Dahmer burning Billy Moss went with the group on the dry run. Sessum said that they looked the Dahmer area over carefully adding that after the dry run Billy Moss said he wanted nothing further to do with the Dahmer project since Henry DeBoxtel was handling it.
Further discussion was had concerning the possible identity of FBI informants. Sessum said that two or three people could be talking about the Dahmer burning. He suggested as one of these a man named Noble or Nobles. I told Sessum I was not acquainted with this person, and Sessum replied that I would know him if I saw him as Noble is a member of the Jones County Klavern Number 4, WKKKKOM.
Sessum then suggested that another person who might be talking is William Ray Smith, adding that Smith was getting drunk quite a bit recently. Sessum then asked if I was aware of the fact that Smith at one time was an inmate in an insane asylum. I asked Sessum which Smith he meant, and *883 he said it was the William Ray Smith who lives on Magnolia Street in Laurel and works at Masonite. Sessum remarked that he was concerned about Smith, whom he stated was on foot without a car and would possibly talk for money.
I asked Sessum about anyone who might be talking about the Dahmer job, and he suggested Pitts, who he stated had gone to Texas with "Shorty" Lowe and said, "There ain't no telling what Lowe and Pitts have said."
Sessum said further he would not put it past Pete Martin to talk and added that Pete Martin would sell anything for money.
Billy Moss came to my farm at about 9:00 A.M., Sunday, February 20, 1966, at my request. I told Moss that I was initiating an investigating committee into the Dahmer matter and that in order to do so, I had to know complete details. I then asked Moss point blank whether he went on the Dahmer job and who participated. Moss said that after the special meeting before the Dahmer burning after I left him with the group at McCarty's Texaco Station, he, Moss, went on the dry run with the group. He said that on this dry run the group checked the distance carefully between Dahmer's store and his house. Moss said that after returning from the dry run he found out that Sam Bowers and Deavours Nix did not intend to go personally on the Dahmer job and that they wanted Henry DeBoxtel to take over the operation of the job. Moss said he pulled out after the dry run and had nothing further to do with the Dahmer burning because, "I didn't trust that damn Henry DeBoxtel." I questioned Moss in an effort to satisfy myself whether he actually had gone on the Dahmer hit. Moss reminded me of a telephone call which he made to me on the morning after the dry run referred to above in the course of which call Moss said in effect, "I won't buy that wagon with that bunch that went to look at it last night." When Moss reminded me of this call, I remembered it and Moss told me this was his way of saying on the telephone that he did not intend to go on the Dahmer hit because he did not trust Henry DeBoxtel.
On Thursday afternoon, February 24, 1966, Deavours Nix came to my shop. Nix said that Sam Bowers was in hiding, apparently expecting to be arrested. I told Nix that Bowers had begged money for the men in trouble in Philadelphia and Natchez, Mississippi, and that now that the home boys were in trouble, Bowers had hidden. Nix said that Bowers was safe and that at my request he could arrange a meeting between me and Bowers, possibly the next week. Nix told me that the Agents of the FBI did not know anything about the Vernon Dahmer job and that they knew less now than they did three weeks ago. Nix said that the Agents are playing one man against another in an effort to get them to talk and added that if everybody would keep quiet, they would be all right as the Agents knew nothing about the Dahmer job.
Nix requested that I organize an investigating committee in an effort to discover leaks in the Klan organization on the Dahmer matter. He suggested that this committee be composed of number 17 (B.F. Hinton) and number 12 (Lawrence Byrd) and a third man whom I should select. I agreed that an investigating committee was in order and told Nix that I would set it up.
Shortly after Nix left my shop at about 3:15 p.m., Ray Speed Lightsey came in. Lightsey is Exalted Cyclops of Klavern Number 1 at Sandersville, Mississippi. I told Lightsey that Nix had requested me to set up an investigating committee and asked Lightsey if he would serve on the committee. He agreed that he would do so and asked me who the other members would be. I told Lightsey he would not know the identity of the other members but that the committee would be composed of approximately three men.
Lightsey left shortly afterwards, and as he left, Henry DeBoxtel came to my shop. DeBoxtel is a member of Klavern Number *884 4. DeBoxtel said the FBI had attempted to question him on several occasions but that he had refused to listen to them and had turned and walked away each time they attempted to question him. I told DeBoxtel there appeared to be a leak somewhere in the group and told him that Cecil Sessum had recommended that DeBoxtel be put on an investigating committee whose business would be to identify FBI informers. I asked DeBoxtel if he wanted to be a member of this committee, and he said he would serve if I wanted him on the committee.
DeBoxtel then left the shop and shortly after dark Cecil Sessum came to my shop. I dismissed my employees and sent everyone home, leaving Sessum and me alone at the shop. Sessum said the FBI had not been following him for the past two days and he commented that this must mean "the lull before the storm," or that the FBI must be on the wrong track. I told Sessum we had to get together and that he had to tell me the complete story of the Dahmer burning. Sessum wanted to know why this was necessary, and I explained to him that it was necessary in order to identify FBI informers. I told Sessum that unless he was willing to tell me the complete story, that he (Sessum) would have to shoulder the responsibility for the outcome and that I was through. We then made arrangements to rendezvous about 7:15 p.m. that night at Frank R. Lee Trailer Sales or at the Texaco Service Station across from this trailer sales in Laurel. At approximately 8:45 p.m. that night Cecil Sessum telephoned me at my home and said that he (Sessum) was "ready to pick up the merchandise." This indicated he was ready to rendezvous. I then drove to Frank R. Lee's Trailer Sales and met Sessum, who was alone in his Comet automobile. I left my pickup truck and got into the Comet with Sessum, and we drove on Highway 11 to the old convict camp located almost opposite from the Marion Motor Court. From there we drove into the woods to talk. Sessum repeated statements he had previously made on numerous occasion that he did not want to talk in the car for fear that it may be "bugged," so we got out of the car and walked about 50 yards distance into the woods. I told Sessum that he knew I did not go on the dry run or on the job when Dahmer's place was burned and that I did not even know where the "nigger" lived. I told Sessum that, despite this, I was involved as an accessory and that my neck was "on the chopping block." I told Sessum that I had to have the complete story of the Dahmer burning in order to conduct an investigation to identify who was talking. Sessum replied, "My neck is in the noose and I don't trust anybody." I then told Sessum that if he had no more confidence in me than that, he could take me back to my truck, or I would walk, that I wanted nothing further to do with the matter and that he could take full responsibility. Sessum asked me not to leave and then agreed to fill me in on the Dahmer burning. Sessum said, "Let's go back to the night when we met at McCarty's Service Station to go on the dry run." Sessum said that after I left the group at McCarty's, the men who were going on the dry run went from McCarty's to John's Cafe at Laurel. Deavours Nix sent his wife home and Nix, Sam Bowers, Henry DeBoxtel and Cecil Sessum went to Nix's office at John's Cafe while the other men waited outside. According to Sessum, Nix and Bowers explained that there was no necessity for them to go on the dry run inasmuch as they had already investigated the area. Sessum said that Bowers then made a sketch of the Dahmer area, including Dahmer's house and store and the surrounding roads. Nix made reference to the distances between Dahmer's house and store and filled in some detail on the sketch prepared by Bowers. Sessum said that Henry DeBoxtel was put in charge of one car and that he, Sessum, was in charge of the other car. It was agreed that six men, all told, would go on the actual hit. Sessum said the following men went on the dry run, without designating which car they rode in:
 Billy Moss
 William Ray Smith
 Cecil Sessum
*885
 Henry DeBoxtel
 Lamar Lowe
 Pat Lowe
 Pete Martin.
Sessum told me that Billy Moss had been placed under the authority of Henry DeBoxtel and that because of this, Moss withdrew from the project after going on the dry run. Sessum said that after the dry run, he (Sessum) refused to accept William Ray Smith and had him dismissed from the project, explaining that he (Sessum) at one time had an argument with Smith over a girl and that he did not trust Smith.
Sessum said that after the dry run, he and DeBoxtel each had to organize a team of three men, or a total of six men, to handle the Dahmer project. Sessum said he did not know the identity of the men on DeBoxtel's team and that DeBoxtel did not know the identity of the men on his, Sessum's team.
Sessum said that on the night they were to burn the Dahmer place, there was a prearranged rendezvous at 11:00 p.m., but he did not furnish the location of the rendezvous to me. He said that this team left the rendezvous point first and traveled to a second rendezvous point where they exchanged signals with the other car before moving in to burn Dahmer's property. Sessum at this time identified the men in his car as Cecil Sessum, Pitts, and Noble. I asked him about the identity of Pitts and asked if this was the same Pitts who went to Texas with "Shorty" Lowe. Sessum said it was the same Pitts. I then asked Sessum about the identity of Noble, and Sessum said that I should know Noble and that I would recognize him if I saw him.
Sessum said that after the burning of Dahmer's property, his team left the area first in their car, which he did not further describe. Sessum said they drove for a way, away from Dahmer's, and when it was observed that the other car was not following, they turned around and proceeded back to look for it. While driving back to look for the other car, Pitts commented that he had lost his pistol at the scene of the burning. Sessum stated that the pistol Pitts lost was one which had been purchased from a gun dealer named Mayberry by Rogers who runs Rogers Auto Trim in Laurel, and that Rogers sold it "to the boys." Sessum said that there was a mix-up in guns, explaining that there were two pistols identical but one serial number difference and that when Rogers bought one of these from Mayberry, Mayberry put the pistol he sold to Rogers in a box bearing the serial number for the other pistol. Sessum furnished no further specific information on these guns.
Sessum said that they located the other car, which was Giles' 1963 Ford, parked beside the road with two flat tires. Sessum said that when the car he and his crew were in pulled up by the other car, the three men who had been in the other car came out of the woods adjacent to the car. According to Sessum, all three men had socks over their heads and were unrecognizable. Sessum said that the men in the other car were told to take the keys out of the car, but apparently they did not follow instructions, as the key was in the car when it was recovered by the FBI. Sessum said that they discussed towing the other car in or burning it, but decided to leave it on the road as they did not know whether Giles had insurance, plus the fact that the car could be traced back to the Dahmer job anyway since the wheels on the flat tires made marks on the highway.
Sessum stated the other three men got in the car with him and his crew and they returned to the Laurel area, dropping the other three off at two separate places where their cars had been parked prior to going on the Dahmer burning. I questioned Sessum as to whether or not Henry DeBoxtel was one of the other three men, pointing out that he certainly would have recognized DeBoxtel even if he had a sock over his head. Sessum replied that he did not believe DeBoxtel was there as he felt that DeBoxtel would have talked to Sessum after they picked up the other three men. Sessum said he recognized the voice of *886 DeBoxtel's right-hand man as one of the three men and he identified this man as Billy Ray Smith. Although he did not specifically say so, I assumed he referred to the Billy Ray Smith who works at the Laurel Brace and Limb Shop, whom I know by the name Billy Ray Smith.
Sessum suggested that if we could get together with Billy Ray Smith, whom Sessum described as DeBoxtel's right-hand man, that he (Sessum) believes Smith would identify the men in the other car who participated in the Dahmer burning. It was agreed that Sessum would contact Smith in an effort to arrange a meeting between us and that Sessum would let me know by 7:00 a.m., Friday, February 25, 1966.
Cecil Sessum telephoned me on Friday morning, February 25, 1966, and said that it would be Sunday night before they could have a meeting with Billy Ray Smith. I was supposed to contact Clifton or Clifford Wilson, who owns the Laurel Brace and Limb Company, to set up a meeting place. I wish to state that on Sunday night, February 27, 1966, I met at the Laurel Brace and Limb Company together with Cecil Sessum, Clifford or Clifton Wilson, and Billy Ray Smith, the latter an employee of Wilson, at the Laurel Brace and Limb Company. I became engaged in conversation, before the arrival of Sessum, with Smith and Wilson, at which time I expressed concern that someone was talking to the FBI about the Dahmer burning. Smith then asked the purpose of the meeting that night, I told him the time had come to "come clean" and that Sessum and I were organizing an investigating committee. Smith said he had no information concerning the Dahmer matter.
Later on, Smith said he knew what was causing all the trouble and related that all of the men were dating the same women in Laurel and engaging in arguments among themselves over these women, which was causing trouble within the Klan. I agreed with Smith and pointed out the fact that Henry DeBoxtel, Travis Giles and E.J. Ishee had been dating the same woman and that she had been picked up on a stolen car charge.
Shortly thereafter Cecil Sessum arrived at the Laurel Brace and Limb Company. I told the group that there was a leak in the Klan organization at Laurel and that a committee was being appointed to determine who was talking. Smith asked me if I knew the identity of the persons who participated in the Dahmer burning. I told him that I did not know their identities but that my name had been mentioned and I told him that Sessum had recognized Smith's voice as one of those individuals in the car that was shot down on the Dahmer job. Smith denied that he had been on the Dahmer job and said he did not know what car they were talking about. Sessum acknowledged at this time in the presence of Smith and Wilson that he had told me he recognized Smith's voice as one of the three men in the car down there. Smith again denied having any knowledge of the Dahmer matter and said he did not know what car they were talking about.
Smith inquired what would be done with the person who was talking if he was identified. I suggested that they lecture this individual and swear him out of the Klan with the understanding that he would not furnish any more information and would be kept under observation. Smith disagreed and said it had already been discussed at a Klan meeting and decided that the person who was talking would be buried when he was identified.
I again brought up the fact that Smith was implicated as being one of the persons who participated in the Dahmer burning. Smith said that someone was lying about him. Then he looked at Cecil Sessum and stated, "I am now facing him, and if you told Lawrence that, you are going to be in trouble." Sessum said, "I guess I am in trouble anyway. Everybody is against me and the Feds are continually after me."
I asked Wilson for his opinion as to the investigating committee. Wilson said if *887 they appointed outsiders to the committee, meaning persons who did not go on the Dahmer job, they are not going to get anyone to tell them anything. Wilson suggested that they appoint one of those who went on the Dahmer burning to the committee. Wilson said that as County Investigator, he would ordinarily be on this committee anyway, but that in a case of this type, they would have to have an insider as investigator.
Sessum stated at this time he felt he knew who was talking and he identified this person as William Ray Smith, who lives on Magnolia Street in Laurel. Sessum said that William Ray Smith was living illegally with a woman and had accused Sessum of dating this woman. Sessum said that Smith is broke, had lost his car, and would sell out to the "Feds." Sessum said that he was positive in his own mind that William Ray Smith was talking.
I then made the statement that Sessum was involved in the Dahmer burning and pointed my finger at Smith and stated, "And you are involved." Smith stated, "That's a damn lie. I am not involved." At this point Cecil Sessum evidently became very frightened and turned white. I then told the group to give me a list of the ones who went on the Dahmer burning and that I would work it out. Smith said that he was not involved in the Dahmer burning, did not trust anyone, and could not furnish a list of those who went on the burning.

* * * * * *
This statement definitely indicates the appellant's complicity in the proceedings, both before and after the burning.
In McCormick v. State, 159 Miss. 610, 613, 132 So. 757, (1931), it is stated:
Continuous acts or a series of events, especially when closely connected in point of time, which lead up to and are necessary or clearly helpful to a correct understanding of the main transaction  which tend to explain and elucidate the conduct and purposes of the parties  are as much of the res gestae as the direct act itself, and are admissible as a part of the transaction. 16 C.J., pp. 572, 573; 30 C.J., pp. 194, 195; 6 Ency.Ev. pp. 610-612.
See also Smith v. State, 223 So.2d 657 (Miss. 1969); Sessum v. State, 221 So.2d 368 (Miss. 1969); Carr v. State, 218 So.2d 737 (Miss. 1969).
It is our opinion that the entire statement covering matters both before and after the burning clearly establishes overt acts on the part of appellant and his participation in the enterprise. The objection to the admission of the entire statement was properly overruled. It is next argued that the verdict of the jury is against the overwhelming weight of the evidence and results from passion and prejudice.
We think the evidence was sufficient. It is also argued that no corpus delicti was established prior to the admission of the confession. A reading of the record discloses that the first witness, who was the widow of Dahmer, testified that she and the family were awakened by shots and "molotov cocktails" thrown through the glass and told of all of the occurrences involving burning and shooting by men on the outside of the house. The corpus delicti was thus established before the offer of the statement.
The State was granted an instruction that the jury did not have to know that the defendant was guilty. This instruction has been criticized, but has not been held reversible error. Carroll v. State, 215 So.2d 871 (Miss. 1968).
Appellant complains of the refusal of two instructions which were properly refused. The appellant obtained twenty-one instructions which covered every aspect of the case.
The judgment is affirmed.
Affirmed.
ETHRIDGE, C.J., and PATTERSON, SMITH, and ROBERTSON, JJ., concur.