Argued November 21, 1975, affirmed January 12, reconsideration denied
February 19, petition for review denied March 16, 1976

STATE OF OREGON, *Respondent,*
*v.*
KEVIN KING GOLUB, *Appellant.*
(No. 74 2119, CA 4315)

544 P2d 609

*John K. Hoover,* Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*Thomas H. Denney,* Assistant Attorney General,

Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Foley and Fort, Judges.

FORT, J.

**FORT, J.**

Defendant was convicted by a jury of criminally negligent homicide, ORS 163.145. He appeals from the resulting judgment, asserting as his sole assignment of error the admission of certain testimony of two police officers.

A brief statement of the facts relevant to a determination of the particular question presented is necessary.

The defendant was the driver of a car involved in an intersection collision with a motorcycle upon which the decedent was riding as a passenger. Defendant was traveling west on Eighth Street in Eugene. There was a stop sign at the intersection requiring traffic on Eighth Street to stop prior to entering Chambers Street. The motorcycle was traveling south on Chambers Street, the through street.

Promptly following the collision two police officers were called to and made a careful investigation of the scene of the accident. One of the areas of investigation concerned the tire marks left on the pavement by defendant's car. The record shows that Officer Michaelson was the principal investigating officer. We set forth in a footnote[1] the portions of the testimony relevant to the assignment of error.

---

[1] "Q Did you participate in measuring the various marks at the scene?

"A Yes, I did.

"Q Did Officer Thies assist you in that?

"A Yes, he did.

"Q Deputy Michaelson, in becoming a police officer, did you have training in the investigation of accidents, particularly, with respect to marks left by vehicle tires?

"A Yes, I have.

"Q Is that the sort of experience that every police officer—or training that every police officer receives when he joins the force?

"A In reference to details, analysis of skid marks and physical items, properties at the scene, specialized education was provided to me. It was not normally available to other officers.

From that testimony and from defendant's brief it appears that the claimed error relates both to the qualification of the witness as an expert and to a conten-

"Q You had whatever training that's ordinarily given to an officer?

"A Yes.

"Q And then you had some additional specialized training?

"A Yes.

"Q What was the special training?

"A This was a two-week course presented by Northwestern Traffic Institute from Evanston, Illinois, that was conducted at Camp Whitacomb in February 1970. It's a two-week course that's provided which details specifically all phases of accident investigation, skid mark analysis, the gouges, the properties to look for at the scene of an accident to better indicate what has occurred in absence of other substantive facts.

"Q Officer Michaelson, in addition to the training, both general and specialized, that you referred to, in your nearly ten years of law enforcement work, have you had occasion to investigate a number of accidents?

"A Yes, I have.

"Q Do you have any idea how many?

"A In the metropolitan areas that I have been in, probably—I think probably 15 per month for nearly ten years.

"* * * * *

"Q When you were measuring marks left in the intersection, did you note their length and their location?

"A Yes, I did.

"Q And did you take certain notes concerning that?

"A Yes, I did.

"Q Did you also observe any marks near the stop sign that controls the westbound traffic on 8th Avenue?

"A Yes, I did.

"Q Now, were those marks of the same nature of those that were out in the intersection?

"A They were similar but of a different characteristic which would identify them as being acceleration rather than deceleration marks.

"MR. SHEPARD: Excuse me, your Honor. I am going to object to Deputy Michaelson as an expert witness in this regard.* * *

"* * * * *

"THE COURT: The objection is overruled.

"* * * * *

"MR. BILLINGS: Q Deputy Michaelson, what were the characteristics of those marks over near the stop sign that led you to that conclusion?

"A At the easternmost end of those marks, the impression—the mark—the skid—whatever term you care to use—was heavy and black with a darkened portion on either side of each extreme tread width.

tion that whether the tire marks described by the witness supported a conclusion that they were made in acceleration or deceleration of the vehicle was an invasion of the function of the jury and thus that expert opinion concerning either was inadmissible.

The mark continued in a straight line and generally faded at the western end. There were two marks, one I later was able to measure. The second had disappeared before I was able to measure it. They appeared to be parallel with the left mark, being substantially lighter throughout.

"Q Is there a reason why one mark would be lighter than the other?

"A Due to the general characteristics of automotive differentials, one—

"MR. SHEPARD: Objection. I think we went into that yesterday and that would take education in the field of automotive mechanics. I don't think it's been shown the deputy has that.

"THE COURT: The objection is sustained.

"MR. BILLINGS: Q What is the differential of an automobile, Deputy Michaelson?

"A It is that portion of a motor vehicle which changes the direction of force of the driveshaft and transmits that energy to the rear wheels, causing each wheel to move, rotate in the same direction.

"Q How have you come to know that?

"A Having read basic books, went to high school, worked on cars, bought rear axles.

"Q Then I will ask you the question I asked before: What would account for the difference in marks?

"MR. SHEPARD: Objection, your Honor. I still think his qualifications don't show that he is competent to answer that.

"[Colloquy between court and counsel for state omitted.]

"Q What would account for the difference in the darkness of those two marks?

"A It would be the way the differential is made up. Inside it has a special type of locking mechanism in the differential. Once a wheel begins to spin, more power is directed toward that side and less power is directed to the side that has the most traction; consequently, the wheel that has the most traction spins the least and the one that has the least traction spins the most.

"* * * * *

"Q Were there any small pebbles or coarse sand that were in or around these marks that contributed to your conclusions about the marks?

"A Yes.

"Q Perhaps you have already gone into this and I have missed it, but how do those pebbles or grains of coarse sand fit into your conclusion?

"A In ordinary stopping situation, any debris that is on the high-

Defendant contends that "the jury should have been apprised of the observations of the police officers and allowed to form their own opinions and draw their own conclusions." Defendant contends that he was accelerating slowly into the intersection after stopping and that the collision resulted from the excessive speed of the motorcycle. He contends further that the "opinions of [the] officers * * * precluded the jury from considering defendant's theory of the cause of the accident."

Principal reliance is placed by defendant on the case of *Bailey v. Rhodes, Adm.,* 202 Or 511, 276 P2d 713 (1954). In that case the police officer, who investi-

---

way, when a vehicle is stopping, when the tire is locked, will be picked up by that locked tire and will be pushed forward, ground into the surface of the road, but generally pushed forward and be sandwiched underneath the tire when the vehicle comes to rest. This, consequently, would have been picked up and moved forward from its original location.

"In the acceleration mark, pebbles were found that were sitting on the pavement portion of the highway where the skid was located and these small pebbles like pea gravel were found at the end of scratches that were directly on the longitudinal access of the tire treadmark as if they had been sandwiched between a moving tire, the ground, and spun toward the rear toward the direction of force, grinding into the pavement, causing the scratch and then remaining there on that—on the pavement.

"Q Did those pebbles appear to have been disturbed?

"A No, they did not.

"* * * * *

"Q I take it you also examined the marks in the intersection?

"A Yes, I did.

"Q Did those appear to be acceleration or deceleration marks?

"A Deceleration marks.

"Q And from what factors did you draw that conclusion?

"A From the general character and their termination underneath each wheel of the motor vehicle. The vehicle had not been moved. The characteristics of the marks terminating under the rear wheel were that of a broad surface of the tire applied to the highway as opposed to a tire skidding straight forward, and the location of the vehicle at the end of that mark was in a broadside fashion.

"The tire marks that terminated underneath the front wheels started out in a somewhat broadside maneuver and then changed to a straight skid and terminated underneath each of the front wheels. And those wheels were also turned in the direction which coincided with the—its specific marks placed on the highway."

[ 24 ]

gated the accident about an hour after it occurred but was not an eyewitness to it, had been permitted to testify that in his opinion the defendant's vehicle was traveling at a rate of speed "possibly between 70 and 90 miles an hour" at the time of the accident. *See also: Webber v. Yaden,* 232 Or 113, 115-16, 373 P2d 1007 (1962).

In reversing the trial judge, the court in *Bailey* said:

"In every case, when the matter of speed is involved, the question primarily is not how fast the automobile was traveling in specific miles per hour, but rather whether its speed, whatever it may have been in miles per hour, was excessive under all the facts, circumstances, and conditions existing at the time. Competent and qualified eyewitnesses who have observed a motor vehicle in motion may give their opinion as to the rate of speed it was traveling, but one not an eyewitness cannot express an opinion, based solely upon the physical facts existing following an accident, as to the rate of speed prior to the accident. A jury is as well able to draw its own inferences and reach its own conclusions from the facts presented as is the witness. Such testimony invades the province of the jury.

"In the instant case all facts upon which the police officer based his opinion were clearly presented by the evidence * * *. From these facts, the jury was in a position to determine whether the car, immediately prior to the accident, was traveling at an excessive rate of speed under the circumstances; it did not need the assistance of an expert." 202 Or at 523-24.

More recently, our Supreme Court discussed *Bailey* in *Marshall v. Martinson,* 268 Or 46, 55-56, 518 P2d 1312 (1974), as follows:

"In *Bailey v. Rhodes, Adm.,* 202 Or 511, 523, 276 P2d 713 (1954), it was held by this court that 'one not an eyewitness cannot express an opinion, based solely upon the physical facts existing following an accident, as to the rate of speed prior to the accident.' Although that decision has been strongly criticized, it has been cited with approval in several more recent decisions.

"In *Thomas v. Dad's Root Beer, Etc.,* 225 Or 166, 169,

356 P2d 418, 357 P2d 418 (1960), we held that this same rule 'should apply also to testimony from one not an eyewitness to the accident concerning the point of impact on the highway.' In *Vancil v. Poulson,* 236 Or 314, 327, 388 P2d 444 (1964), we reaffirmed that holding.

"We are not called upon in this case to overrule either *Bailey v. Rhodes, supra,* or *Thomas v. Dad's Root Beer, Etc., supra.* Even assuming, however, that the science of accident reconstruction may progress to the point that the rulings in those cases should be re-examined, it does not follow that it was error for the trial court to exclude the expert opinion testimony in this case." (Footnotes omitted.) 268 Or at 55-56.

■ The issue in *Bailey* addressed by the court related to the officer's estimate of the speed of the vehicle when it left the highway. Proper objection was made thereto. Here, on the other hand, examination of the transcript reveals not only that the first expression of an estimated speed by either officer was brought out by the defendant himself in his cross-examination of the first officer,[2] but also that he did not object to testimony from either officer concerning the speed of the

---

[2] Officer Thies testified prior to Officer Michaelson. In his cross-examination the record shows:

"Q Officer, how long, approximately, are these acceleration marks at the stop sign on 8th Street?

"A I don't have the length of them noted down. I believe they were about 16 feet from memory.

"Q And that was measurable on both sides—both wheels?

"A Yes.

"Q Well, from your prior background and expertise in the matter, how fast would you estimate an automobile would be going after laying down 16 feet of rubber? Wouldn't it be perhaps 15 or 20 miles an hour?

"A Probably that or greater. I really don't know. It depends on the vehicle and all the circumstances.

"Q Greater—perhaps greater than 20?

"A Perhaps.

"Q Officer, in analyzing skid marks, is it true that there are three separate sections of the road that should be looked at?

"A I don't really understand what you mean.

"Q Well, is it true that there is an acceleration phase perhaps leaving marks, there is a reaction time, and then there is the deceleration phase—the braking phase?

"A Yes.

vehicle at various points within the intersection. His objections were clearly directed to the qualifications of the officers as experts to express opinions concerning the inferences which could be drawn from the various tire marks. One officer had arrived at the scene within about 10 minutes after the accident and observed the marks; the other arrived about 35 minutes after the accident. Thus we need not and do not decide here the admissibility of the officers' testimony relating to speed, since defendant himself first brought the evidence in and because no proper objection was made to it.

■■■ Here, the primary issue involved the relationship, if any, discernible from the tire marks concerning when and where defendant's vehicle was accelerating or decelerating in the vicinity of and within the intersection. The challenge to the testimony related to whether the tire marks of defendant's car revealed, in the officers' opinions, that defendant's car was at relevant places accelerating or decelerating, and specifically as to whether the officers were qualified to express opinions concerning the marks.

Here, Officer Michaelson, the principal investigating officer, testified at length as appears in footnote 1 concerning the tire marks and described carefully the differences he observed in the marks left by the tires. Clearly such testimony was admissible. *Wood v. Meyer,* 261 Or 113, 116, 492 P2d 468 (1972); *State v. Betts,* 235 Or 127, 134, 384 P2d 198, 7 ALR3d 1445 (1963).

---

"Q Were you able to ascertain where this reaction time period was in the highway?

"A I—there was a space between the acceleration skid and the deceleration skid.

"Q What was the length of that, do you remember?

"A I don't know.

"Q Was it measured?

"A I am not certain that it was. Officer Michaelson would have that if it was.

"Q Thank you, sir.

"I have no further questions, your Honor."

He also described the differences between the marks made on the pavement during rapid acceleration and those made during rapid deceleration of the tire, and particularly with reference to the tire on the wheel which furnished acceleration power in defendant's car.

Is then the determination from tire marks made upon pavement whether a vehicle was at a given place rapidly accelerating or decelerating a matter concerning which a person with the requisite knowledge or expertise who has actually observed those marks may express an opinion?

In McCormick, Evidence 31, § 14 (hornbook series, 2d ed 1972), the author states:

"If an expert witness has firsthand knowledge of material facts, he may describe what he has seen, and give his expert inferences therefrom. In this situation, it is unnecessary to couch questions eliciting the inferences in hypothetical form and it would certainly weaken the effect of the testimony to do so. * * *" (Footnote omitted.)

We conclude that nothing in *Bailey* is inconsistent with the rule announced above. It follows, then, that the matters above set forth relating to the tire marks were properly the subject of opinion evidence.

Was Officer Michaelson qualified to express an opinion on those matters? In *Ritter v. Beals,* 225 Or 504, 525, 358 P2d 1080 (1961), the court said:

"The correct rule is that an expert's fitness to answer opinion questions must first satisfy the discretion of the trial judge. The expert then may express an opinion on an ultimate fact if the ultimate fact cannot be equally well decided by the jury from the same evidence upon which the expert has based his opinion. *Welter, Adm'x v. M & M Woodworking Co.,* 216 Or 266, 278, 338 P2d 651; *Darling v. Semler,* 145 Or 259, 27 P2d 886; *Goldfoot v. Lofgren,* 135 Or 533, 541, 296 P 843. The decision whether to receive the testimony should be left to the sound discretion of the trial judge. Following the preliminary screening by the trial judge, the jury ulti-

mately passes upon the credibility of the witness, the soundness of his judgment, and the existence of the facts upon which his opinion was predicated. *Goldfoot v. Lofgren,* supra."

*See also: Sandow v. Weyerhaeuser Co.,* 252 Or 377, 449 P2d 426 (1969); *Grismore v. Consolidated Products Co.,* 232 Iowa 328, 5 NW2d 646 (1942);[3] McCormick, Evidence, supra at 24.

Here we conclude that the witness was qualified by both training and experience to express his opinion concerning whether the tire marks he personally observed disclosed that the vehicle was accelerating and decelerating at the observed places on its route of travel. We conclude that the trial court did not abuse its discretion in allowing Michaelson to so testify. The challenged testimony of the other witness, Officer Thies, who was present at the scene after the accident and assisted Officer Michaelson in the investigation, including his own careful observation of the tire marks on the pavement, corroborated Officer Michaelson concerning the marks, and his opinion concerning their admissibility is governed by the same rules.

Affirmed.

**SCHWAB, C. J.,** concurring.

As I understand the majority opinion the record discloses that the basic thrust of defendant's objections at trial to expressions of opinion by the police officers was that the officers were not qualified as experts. I agree with the majority that the trial court did not err in holding to the contrary. To me it follows that there is no need to consider an issue raised for the first time on appeal, specifically, whether the opinion evidence in question invaded the province of the jury under *Bailey v. Rhodes, Adm.,* 202 Or 511, 276 P2d 713 (1954).

---

[3]There the court said:

"The courts and other authorities uniformly agree that the receipt of opinion evidence, whether lay or expert, and the extent to which it will be received in any particular case, are matters resting largely in the administrative discretion of the court.* * *" 232 Iowa at 342.