523 So.2d 966 (1988)
James Michael WHITTINGTON
v.
STATE of Mississippi.
No. 57308.
Supreme Court of Mississippi.
March 16, 1988.
Rehearing Denied May 4, 1988.
*967 K. Maxwell Graves, Jr., Meadville, J. Carl Parkerson, J. Randolph Smith, Monroe, for appellant.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Deirdre D. McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
HAWKINS, Presiding Justice, for the Court:
James Michael Whittington appeals from his conviction in the circuit court of Franklin County of murder of his wife Patricia R. Whittington and sentence to life imprisonment. This is a circumstantial evidence case, the defense being that Mrs. Whittington was killed in a one-vehicle automobile accident, while driving a car in which her husband was riding. The jury concluded otherwise.
*968 The issues we address are set forth in our opinion. A careful examination of this record convinces us no reversible error was committed and we affirm.

FACTS
At approximately 10:00 p.m. on Saturday, July 21, 1984, Henry Vanier was driving west on Mississippi State Highway No. 84, accompanied by Sandra Jones and her child. It was a dry, clear starlit night. About one-fourth of a mile before reaching the county line of Franklin County, they passed a man in the road waving. They turned around, came back, and he asked for help. The man was Whittington. Off the south side of the highway (which runs east-west), and down an embankment approximately 12 1/2 feet deep was a four-door Lincoln Continental automobile headed west. The lights were on and the motor was running. The trunk was open, the door on the driver's side was closed. The front seats, left and right, were upright.
Behind the car was a woman, who Vanier attempted to revive by mouth-to-mouth resuscitation, but she was dead. This was the corpse of Mrs. Whittington.
Whittington asked that his friend John Gore in Monroe, Louisiana, be called. Whittington appeared to Vanier and Sandra Jones to alternate between being calm and hysterical.
Highway Patrolman Darryl Swanigan was one of the investigating officers. When he first arrived at the scene, he saw Whittington bending over the body as though he were about to give mouth-to-mouth resuscitation. Swanigan detected no vital signs on the body of Mrs. Whittington, which felt cool to him.
There was virtually no damage to the car. There was a small dent on the side of the driver's door, some molding had been torn off, and the left outside mirror was bent down. Also, the hood ornament was broken, and there was a crack in the upper right hand corner of the windshield. Once the car had been pulled away from where it was stuck, it was driven back onto the highway.
There was a profusion of blood around the rear of the left door, downwards from the glass. Blood was inside the left door opening on the door facing and the post, and on the outside of the car just to the rear of the left door opening. There was some blood on the left carpeting and driver's seat. No blood was observed on the dashboard or steering wheel.
By tracing the tracks of the car, Swanigan was of the opinion the car veered first off on the north shoulder, then took a 90-degree left turn south across the highway, and then turned back westerly at an angle, and ran off the south side down the embankment. In doing so, it struck a wooden highway construction sign on the south shoulder, tearing off a part of it.
The car came to rest in a thicket of weeds, briars and bushes approximately 180 feet from where it left the highway. There was also testimony of small trees or saplings in the path of the car.
The body of Mrs. Whittington was behind the car and over a tire track, laying prone, face up. The face and upper clothing showed signs of massive bleeding.
The officers detected no signs of injuries to Whittington.
The officers were unable to question Whittington that night, but Tyrone Lockwood, a patrolman, heard Whittington tell a bystander that he was asleep in the car and heard Mrs. Whittington "holler" and woke up and saw her jumping out of the car.
The body of Mrs. Whittington was approximately 138 feet from the edge of the highway. From the mid-thigh region down, her body lay inside the tire tracks, and the rest of her body was outside the tire tracks. The tire tracks from the edge of the pavement to where the car came to rest were unbroken. There was no evidence of the car wheels running over Mrs. Whittington.
Photographs were taken that night at the scene of Mrs. Whittington's body and the automobile.
The body of Mrs. Whittington was taken to the Jeff Davis Hospital in Natchez that *969 night; Whittington was admitted to the hospital. The officers endeavored to question him, but he did not talk to them. A nurse told them she didn't think they could get anything out of him because of his condition; the nurse, however, went in to ask him. Whittington came out of the room and was in sort of an outrage, walking the halls back and forth. He was released the next day. The car remained in Franklin County until it was taken to Monroe, Louisiana.
Gary Austin, a criminal investigator, and Charles Scarborough, an accident reconstructionist, both employed by the Mississippi Department of Public Safety, took a number of color photographs of the car in Monroe on July 25, 1984.
The body of Mrs. Whittington was exhumed on December 18, 1984, and an autopsy performed on it the next day by George M. McCormick, II, a Shreveport, Louisiana, pathologist.
Dr. McCormick observed numerous injuries about her body, head and face. There was a large bruise on the outer aspect of the thigh. There were abrasions on the top of her feet. There was a bruising on the point of her right shoulder, her right biceps at the top part, her right elbow, and undersurface of her right forearm, on top of her right hand, and "snuff box" of her right hand (the cupping in hand between thumb and forefinger).
There was a bruise from her left shoulder down to her left elbow, and a smaller bruise inside the elbow. There was a large bruise on top of her left hand, a very large bruise on her back over her left shoulder blade, which went halfway down her back. There was a large bruise over her right nipple, and the belt level of her hip bone. Bruising was generalized over her body, except on top of her feet, where the abrasions were.
There was a complex of bruises and abrasions over her entire forehead, which were more severe on the left side. There were extensive bruises around both eyes, and a laceration on the outside of the upper left eyelid. There were bruises and lacerations on her nose. There was a laceration down the center, and two off to the side of the nose. He also noted small tears on the under surface of the left side of the nose as if the nose had been pushed upward and torn. There was a large bruise under her chin towards the right, and a long laceration along the jawbone.
There were no fractures or broken bones found.
There were several large lacerations on her scalp through to the skull. Two were long in a straight line from front to back with a circular laceration from the top of her left ear to the back of her head. He noted another large laceration beginning at the right ear, and running back, making a right angle intersection to form a laceration with another laceration, which ran across to the back of the skull towards the left ear, which appeared ragged. There was bruising on top of the head and beneath the scalp. There was extensive bruising over her entire skull. There was hemorrhaging beneath the entire scalp surrounding the lacerations. There was extensive hemorrhaging around and into the brain. There was subdural hemorrhaging down to the spinal cord. The bruises on the brain were continuous on the right side and at the back.
He found the inside of her mouth clean and with no signs of injuries, but in her airway he found a large impacted mass of grass, rocks, dirt and other debris. He found a three-to-four-inch stem there of what he termed as sage grass.
The grand jury of Franklin County indicted Whittington for murder on May 27, 1985, in violation of Miss. Code Ann., § 97-3-19(1), and the case went to trial on January 21, 1986.
Vanier, Swanigan, Austin and Lockwood testified to the facts as above related. Paul Michael Parker, a local embalmer, testified that he observed nothing unusual in Mrs. Whittington's mouth. Percy Peeler, county coroner, and Sandra Jones also testified as State witnesses.
Another investigator of the scene was Grover Allen Chandler, a highway patrolman of 19 years' experience. After relating *970 what he had observed at the scene, he was permitted to testify, over defense objection, that following his investigation he did not think Mrs. Whittington was "killed in the wreck." (R. 588)
Charles Scarborough, an employee of the Department of Public Safety, was permitted to testify as an "accident reconstructionist." His specialized training consisted of a seven-week course at Northwestern University. He said he had obtained a degree in law enforcement from the University of Mississippi. He had taken three hours of college algebra, but no course in either physics or chemistry.
Scarborough testified that the black mark at the edge of the pavement was a tire mark, and over defense objection was permitted to testify that it was an "acceleration scuff" as opposed to a skid mark. According to Scarborough, a rubber mark made by acceleration would be heavier and darker at the beginning of the mark (in the direction in which the car was moving), and a skid mark would be the reverse. He also based his opinion on the rocks in the asphalt where the tire mark was made.
Also, over objection, Scarborough testified that the car could not have been traveling over sixteen miles an hour as it went over and down the embankment, that it would have had to be traveling in excess of this speed in order for there to have been any break in the tracks.
Dr. McCormick qualified as an expert in forensic pathology, and related the injuries he had observed on the body. He also had taken photographs of the head and body. He conceded his examination would have been better had he seen the body before embalming and burial.
He was of the opinion her head had been struck from three different directions by a moving object. He stated that when the head struck a stationary object, injuring the brain, the bruise on the brain would generally be on the opposite of the bruise on the surface. This was because the brain was in a fluid inside the skull, and when the head struck a stationary object, the brain bounced off the opposite side of the skull. On the other hand, if the head were struck by a moving object, the bruises to the brain would be on the same side as the blow. These blows caused the extensive lacerations about which he testified.
He was of the opinion that the blood stain on the outside left rear door was caused either by the wind or by the bushes. If bushes, however, they would have been "very low bushes". He testified that in his examination of hundreds of motor vehicle fatalities, he had never seen one where the only injuries to the body were contusions, as in this case; and further when injuries were caused by cars there were sharp objects which scraped or tore the body. Such injuries were not present on her body.
Dr. McCormick further noted the presence of wounds about the body consistent with what forensic pathologists called "defense wounds." That is, the hands, the back of the hands, in warding off an attack, the elbows in ducking and dodging, and the shoulders or back, were all bruised.
While of the opinion Mrs. Whittington's body fell out of the car while bleeding, Dr. McCormick ruled out injuries to her being caused by the door, stating they did not fit anything he observed about the door, the facing or post, or hinges, bolts or the door lock. From the blood patterns he was of the opinion Mrs. Whittington was in the car bleeding, and leaning against the left door glass prior to the door being opened, and the blood going outside the car.
He was of the opinion the blows on her head were not struck in the car, but were administered outside the car. He based this conclusion on the difficulty anyone seated in the car having enough room to inflict the severe wounds found on her head, and also such blows would have in some way damaged the car's interior. Likewise, the blood stains evidenced bleeding wounds, not blood spraying up from a wound being inflicted.
Dr. McCormick said the exterior and interior of Mrs. Whittington's mouth showed no signs of injuries, which would have been present if she had sucked the debris and trash in during an auto accident. He therefore concluded she did not get the rocks, *971 dirt, or debris in her throat from an accident. He said this was the sort of material which was along a road side.
From the pattern of blood which Dr. McCormick observed, he was of the opinion she was struck while seated, her head bent over. He stated that only her head wounds caused the bleeding. There was a massive amount of blood on her chest down to her rib cage, where it stopped. Blood spatters were on her slacks, indicating they were caused while the wounds were being inflicted.
Dr. McCormick testified Mrs. Whittington was a woman approximately 5 feet 5 inches tall, weighing 110-120 pounds.
Whittington did not testify.
The defense offered Ray Herd, an expert in accident reconstruction. He held a bachelor's degree in chemistry, and had organized the Louisiana state crime laboratory in the 1950s. He spent 33 years in police work before forming his own private laboratory.
From his examination of the photograph of the tire mark on the pavement, he was of the opinion it could not be ascertained whether it was a skid or an acceleration mark. He was also of the opinion that the car could have been traveling as much as 30 miles per hour and still have made solid tracks, never leaving the ground. He was of the opinion her death was more consistent with an accident than murder.
Albert S. Donald, a surgeon of West Monroe, testified that in 1982 he removed Mrs. Whittington's appendix when he also performed a total hysterectomy. This contradicted Dr. McCormick's noting in his examination a "small appendix" and a uterus.
Barry S. Seng, M.D., testified that he saw Whittington on July 9, 1984, when he treated him for a cut on his arm and a back strain, and again on July 13 when he treated him for the back strain. He said it would be difficult for Whittington with his back strain to have lifted a 120-pound person.
Kermit Lamar Walters, Jr., a forensic pathologist, and medical director of Roche Biomedical Laboratories in Monroe, testified that he had examined Dr. McCormick's report and the photographs, after being employed three or four days prior to trial.
He was of the opinion Mrs. Whittington's nose was broken, and that the car door could have made the injuries to her. In his opinion, "Mrs. Whittington died of head injuries received in an automobile, one-vehicle automobile accident after being struck by the door of the car and also tumbling down the hill, receiving additional injuries to her body." The "major" injuries were caused by the door. "Some" of her head injuries were caused by the tumbling.
He testified that it would have been impossible for a person to open Mrs. Whittington's jaw after she was dead and stuff the trash, dirt and debris down her throat. He also said this could have been in her mouth and the embalmer may have washed some of this down when he cleaned the body, and overlooked injuries to her mouth.
Walter Ebel testified that Whittington and Mrs. Whittington had been at the Moose Lodge in New Orleans the day of July 21 to pick up some shrimp he had gotten for Whittington. Photographs made of Whittington and Mrs. Whittington and of Ebel taken that day were introduced into evidence. Whittington was shown wearing red coveralls.
Eddie Ray Dye testified to repairing the car and noticing hair and foreign material spread over the door. He said it took approximately $2,000 to repair the car, but did not bring his estimate. On cross-examination he said the dent in the left door was 12-to-14 inches in length, the mirror was bent, and a piece of chrome was missing. Don Rice, body shop mechanic, also testified to the blood and foreign material, and damage to the car.
Sadie Faulkner, a friend of Whittington and Mrs. Whittington, said she saw Whittington at John Gore's home after the accident, and washed blood off his hands, between his fingers and fingernails. She said Mrs. Whittington had told her she once saw a car afire in which a woman and child burned to death. Mrs. Whittington was *972 nervous in a car and would ride with one hand on the door and the other in her lap.
John Gore testified that the night following the accident he noticed a knot on Whittington's head. He also related how Mrs. Whittington was nervous in a car, and always chose to sit by a door. He said Whittington told him he heard his wife scream and he reached for her and she opened the door. Louise Gore also recalled Mrs. Whittington's nervousness in riding in a car, and that she would have a hand on the door handle. She would not wear a seat belt.
Following instructions and argument, the jury returned a guilty verdict, and Whittington was sentenced to life imprisonment.

LAW
Although not the first assignment of error, of necessity we must initially address the question whether there was a jury issue made on Whittington's being guilty of murder.
There is no question but that Mrs. Whittington was killed by trauma. There were repeated violent blows to her head causing massive bleeding, as well as blows bruising her hands, arms and body.
The only eyewitness was Whittington.
There are but two hypotheses. First, she died solely as a result of the Lincoln automobile causing these wounds in some sort of accident, with Whittington playing no part in its causation, in which event he would be innocent.
Or second, she did not receive these violent injuries in this manner. If she did not, then the jury was justified in finding Whittington had some hand in it. In this event, the jury was warranted in finding him guilty of murder.
The question facing this Court, therefore, is not precisely the manner in which she was killed. Whittington being the only person present, this may never be precisely determined. Instead, the question is whether the jury was warranted in concluding it was not the first hypothesis, beyond all reasonable doubt and to the exclusion of every other reasonable hypothesis. It is well settled that a conviction of murder based solely upon circumstantial evidence may be warranted, and will be upheld by this Court. Smith v. State, 492 So.2d 260, 266 (Miss. 1986).
We conclude the jury was well warranted in finding Mrs. Whittington's death did not result from an accident in the automobile.
The jury had before it the numerous photographs of the car, as well as photographs of Mrs. Whittington's body as it lay flat and face up on the ground, and also the photographs made by Dr. McCormick of her scalp and face and the debris in her throat. They had the testimony of the officers as to the unbroken tire tracks after the car left the pavement, and that a part of her body was laying within the tire tracks, approximately 40 feet behind the car. They had the testimony of Vanier that the driver's door was closed when he got to the car, and the seats were upright. He also noticed that the trunk was open and the motor was running.
They had the testimony of Dr. McCormick giving in detail why the wounds were not made by the car, and also why they were consistent with a violent beating, with the victim attempting to ward off the blows. Roadside debris was in her throat, and yet the embalmer and Dr. McCormick detected no wounds to her mouth, gums or teeth.
Also for the jury's determination was the credibility of Dr. Walters' testimony.
The jury also was presented the stipulation by counsel that there was over $450,000 life insurance in effect on Mrs. Whittington, a good portion of which was double indemnity in event of accidental death.
This Court is always cautious in a circumstantial evidence case. Ratliff v. State, 515 So.2d 877 (Miss. 1987); Algheri v. State, 25 Miss. 584 (Miss. 1853). Yet our standard of review in a conviction based upon circumstantial evidence must be distinguished from the burden of proof evaluated by the jury. Our standard is that a circumstantial evidence conviction will not be disturbed unless it is opposed "by a *973 decided preponderance of the evidence." Kitchens v. State, 300 So.2d 922 (Miss. 1974); Johnson v. State, 23 So.2d 499, 500 (Miss. 1945). See also Ratliff v. State, supra; McFee v. State, 511 So.2d 130, 134 (Miss. 1987); Fisher v. State, 481 So.2d 203, 213-14 (Miss. 1985); Toncrey v. State, 465 So.2d 1070, 1072 (Miss. 1985); Blanks v. State, 451 So.2d 775, 779 (Miss. 1984); Winters v. State, 449 So.2d 766, 771 (Miss. 1984). Also, see: McGilvery v. State, 497 So.2d 67, 69 (Miss. 1986); Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981) (Justice Powell, concurring).

INSPECTION OF CAR
At a pre-trial hearing it developed that the title to the Lincoln automobile was in the name of Whittington's brother, Edward L. Whittington, who lived in California. Edward Whittington gave as his reason for having the car in his name first, was that his brother owed him "a considerable amount of money." On cross-examination, however, he admitted that on August 31, 1984, he executed an instrument giving the car to Mrs. Whittington's parents, Charles R. and Mrs. Laura B. Redding. He also stated the car had originally belonged to the Reddings. There was also some suggestion Whittington may have been having a dispute with the I.R.S.
On July 25, 1984, Officers Austin and Scarborough, accompanied by Donald French, with the Louisiana State Police, went to Whittington's home to ascertain the location of the car, and obtain Whittington's permission to search it. This happened to be the day of Mrs. Whittington's funeral. A John Dugger answered the door, and shortly Edward Whittington, Whittington and Dugger returned to the carport where the officers were.
According to Austin, French and Dugger, Whittington readily gave his permission to search and inspect the car, and instructed an employee, Roy Knighten, to show the officers the location of the car, which had been driven across the road from another employee, Neil Duke's, home. Following this permission, the officers drove to the automobile, searched the car, took the scrapings, and made the photographs which were introduced into evidence. The officers and Dugger testified Whittington was alert, coherent and rational when they requested and he gave permission to inspect the car.
At the hearing Edward Whittington testified his brother was taking medication, and he did not recall his brother giving permission. He also testified that his brother was groggy, disoriented and somewhat hysterical.
Following the hearing, the circuit judge overruled the motion to supress the results of the inspection and search of the automobile.
There was no error committed by the circuit judge in holding that permission to search was not the result of any duress and was freely and voluntarily given. Jackson v. State, 418 So.2d 827, 830 (Miss. 1982).

COMPETENCY OF PHOTOGRAPHS
Before the pictures taken of the car on July 25, 1984, were introduced into evidence, the State offered testimony that it was in substantially the same condition it was in on July 21. It was proper to offer the pictures of the car, including Exhibit 32, showing the car's interior, into evidence. Lowery v. Illinois Central Gulf R.R., 356 So.2d 584 (Miss. 1978); Nelson v. Phoenix of Hartford Ins. Co., 318 So.2d 839 (Miss. 1975); Sullivan v. State, 213 Miss. 14, 56 So.2d 93 (1952); Patton v. Nelson, 51 So.2d 752 (Miss. 1951).

FAILURE TO SEQUESTER JURY
Uniform Criminal Rule 5.07 states:
In all other criminal cases, the jury may be sequestered upon request of either the defendant or the state made at least 48 hours in advance of trial. The trial judge may, in the exercise of sound judicial discretion, either grant or refuse the request to sequester the jury. In the absence of a request, the trial judge may, on his own initiative, sequester a jury at any stage of a trial. [Emphasis added]
*974 Trial in this case began January 21, 1986. The motion to sequester was filed January 20, the day previous. Whittington therefore waived his right to have the jury sequestered. Griffin v. State, 492 So.2d 587 (Miss. 1986).
We do urge circuit judges in criminal cases of this magnitude to sequester the jury, however.

CHANDLER'S OPINION
Whittington argues it was error to permit Officer Chandler to express the opinion that, following his investigation at the scene of the accident, he did not think Mrs. Whittington was "killed in the wreck." The basis of this assignment is that Chandler was not qualified to express such an opinion, and further, that it was an expression of the ultimate issue and invaded the province of the jury.
Rules 701 and 704, of the Mississippi Rules of Evidence, together with the comments, state the following:
RULE 701. OPINION TESTIMONY BY LAY WITNESSES
If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of his testimony or the determination of a fact in issue.
Comment
The traditional rule regarding lay opinions has been, with some exceptions, to exclude them from evidence. Rule 701 is a departure from the traditional rule. It favors the admission of lay opinions when two considerations are met. The first consideration is the familiar requirement of first-hand knowledge or observation. The second consideration is that the witness' opinion must be helpful in resolving the issues. Rule 701, thus, provides flexibility when a witness has difficulty in expressing himself in language which does not reflect an opinion. Rule 701 is based on the recognition that there is often too thin a line between fact and opinion to determine which is which. [Emphasis added]
RULE 704. OPINION ON ULTIMATE ISSUE
Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
Comment
Rule 704 abolishes the "ultimate issue rule" which existed in pre-rule Mississippi practice. The ultimate issue rule was often unnecessarily restrictive and generally difficult to apply. More often than not the invocation of the rule served to deprive the trier of fact of useful information. Rule 704 clarifies much of the confusion over the ultimate issue rule. An opinion is no longer objectionable solely on grounds that it "invades the province of the jury."
The State argues the literal language of the Rules permit a trial court discretion to allow an opinion such as that expressed by Chandler.
The State is in error, however. In the first place federal courts in interpreting Rule 704 have invariably applied it to expert testimony. See: United States v. Barrett, 703 F.2d 1076 (9th Cir.1983); Wade v. Haynes, 663 F.2d 778 (8th Cir.1981), affirmed 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); United States v. Grote, 632 F.2d 387 (5th Cir.1980), cert. denied 454 U.S. 1129, 102 S.Ct. 983, 71 L.Ed.2d 118 (1981); United States v. Miller, 600 F.2d 498 (5th Cir.1979), cert. denied 444 U.S. 955, 100 S.Ct. 434, 62 L.Ed.2d 327 (1979); United States v. Taylor, 562 F.2d 1345 (2nd Cir.1977), cert. denied 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977). Chandler was not shown to have any special qualifications to express such an opinion.
Furthermore, even if Chandler had qualified as an expert, he gave no basis for this opinion, and the answer was objectionable on this ground as well. See: Tabatchnick *975 v. G.D. Searle & Co., 67 F.R.D. 49 (D.C.N.J. 1975); United States v. Jackson, 688 F.2d 1121 (7th Cir.1982), cert. denied 460 U.S. 1043, 100 S.Ct. 1441, 75 L.Ed.2d 797 (1983); Simon v. St. Louis County, Mo., 656 F.2d 316 (8th Cir.1981), cert. den 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982); Meder v. Everest & Jennings, Inc., 637 F.2d 1182 (8th Cir.1981).
Moreover, as noted in the comment to Rule 704, the abolition of the ultimate issue rule does not result in the admission of all opinions. It must be "helpful to a determination of the case." Questions which would merely allow a witness to tell the jury what result to reach are not permitted. Owen v. Kerr-McGee Corp., 698 F.2d 236 (5th Cir.1983). If it were proper for Officer Chandler to express such an opinion, it would be just as proper for the defense to parade witnesses before the jury to express an opposite opinion.
We nevertheless conclude the answer given by Chandler was harmless. It was no more than an expression that his suspicion was aroused following his investigation there at the scene. See: Askin v. State, 178 Ga. App. 810, 344 S.E.2d 699 (1986). Every juror already knew, of course, that the investigating officers at the scene were suspicious, or else the investigation would not have continued. A much more serious question would be presented if Chandler had been asked and permitted to testify at the trial that he did not then think she had been killed in the wreck.
Finally, the testimony of the investigating officers was followed by Dr. McCormick, who in great detail set forth reasons why in his opinion Mrs. Whittington was not killed in an automobile accident. See: Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); U.S. v. Murphy, 763 F.2d 202 (6th Cir.1985); State v. Rushing, 464 So.2d 268 (La. 1985); State v. Workman, 667 S.W.2d 44 (Tenn. 1984).

SCARBOROUGH'S TESTIMONY
Whittington attacks Scarborough's testimony, contending "accident reconstruction" evidence should not be allowed in criminal cases. Such opinions have been approved by this Court in civil cases. Hollingsworth v. Bovaird Supply Co., 465 So.2d 311, 313 (Miss. 1985). We find no reason to restrict such testimony to civil cases. See: New v. State, 714 P.2d 378 (Alaska App. 1986); State v. Passarelli, 130 Ariz. 360, 636 P.2d 138 (App. 1981); Brown v. State, 377 So.2d 1139 (Ala.Cr.App. 1979); State v. Golub, 24 Or. App. 19, 544 P.2d 609 (1976). See also Mississippi Rules of Evidence, Rules 702 and 704 and comments.
Scarborough expressed two opinions, first that the tire mark at the edge of the pavement was an "acceleration mark" as opposed to a skid mark. He gave as the basis for this opinion a well-recognized method of determining how tire marks are made on pavement. No doubt many highway patrolmen are capable of examining tire marks such as this and reaching valid conclusions of the type of car movement which made them.
The record does not reveal, however, any specific scientific or technical training or experience of Scarborough which qualified him as an expert on the speed the car was traveling as it went off the highway and down the embankment. It was therefore error for the circuit judge to permit Scarborough to express the opinion that the car was not going over sixteen miles per hour as it went off the highway.
This was totally harmless, however, because the only purpose in expressing this opinion was to show the vehicle never left contact with the ground. Two officers testified positively to this fact from personal inspection of the tracks at the scene, and this testimony is undisputed.

DISCOVERY VIOLATION
The prosecuting attorney and defense counsel were present at an interview of Dr. McCormick. The State made a tape recording of the interview, which was transcribed. Prior to trial, upon Motion, the State furnished defense counsel with a transcription of the tape, but a portion of the transcription was inadvertently omitted. The circuit judge then permitted defense *976 counsel to hear the omitted portion of the tape in chambers. The defense made no motion for a continuance.
Whittington argues reversible error was committed in the State's failure to furnish the defense the entire transcription from the tape. There is no merit to this assignment.
In the first place, the defense was given complete access to Dr. McCormick, and to inspect and make copies of all his records. There is no specific requirement in Rule 4.06 of our Uniform Criminal Rules imposing upon the State a duty of furnishing the defense the tape made by the State of a recorded interview with a witness the defense has also interviewed.
In the second place, defense counsel was present at the interview which was tape recorded. Finally, the defense made no motion for a continuance when they heard the omitted transcript portion of the tape played in chambers. Any difficulty caused by the State's failure to furnish such transcript could have been easily corrected by a short recess, and the defense made no request for such recess. Jones v. State, 481 So.2d 798 (Miss. 1985).

TESTIMONY OF DR. McCORMICK
Whittington has a grab-bag of assignments of error pertaining to the testimony of Dr. McCormick. He contends Dr. McCormick should not have been permitted to testify as to the cause of Mrs. Whittington's death, give opinions as to the blood splatters on her clothing, and the debris in her throat. The record shows that in his professional career Dr. McCormick had performed several thousand autopsies of trauma victims. The matters upon which he expressed an opinion were clearly within his field of expertise, and he gave a detailed basis for every conclusion he reached and about which he testified. Mississippi Rules of Evidence 702  704 clearly authorized opinions of forensic pathologists such as those expressed by Dr. McCormick. Moreover, this Court has consistently recognized opinion evidence by forensic pathologists such as that given by Dr. McCormick. Fairman v. State, 513 So.2d 910 (Miss. 1987); Wetz v. State, 503 So.2d 803 (Miss. 1987); Weeks v. State, 493 So.2d 1280 (Miss. 1986); Jackson v. State, 441 So.2d 1382 (Miss. 1983); Gholar v. State, 441 So.2d 113 (Miss. 1983); Rogers v. State, 307 So.2d 551 (Miss. 1975); Fabian v. State, 284 So.2d 55 (Miss. 1973). No error was committed in admitting such testimony of Dr. McCormick into evidence.
Whittington additionally assigns as error the admission into evidence of certain photographs taken by Dr. McCormick of Mrs. Whittington's head. These photographs were offered by the State on its re-direct examination of Dr. McCormick. Upon cross-examination defense counsel had thoroughly questioned Dr. McCormick on the basis for his conclusions as to the cause of Mrs. Whittington's death, and that it did not occur from an automobile accident. The purpose of the photographs on re-direct was to show the particular type of wounds made on her head, and were competent for this purpose, albeit graphic. Whittington contends, however, that the State did not produce these photographs prior to trial, and introducing them into evidence was a discovery violation. Again, Whittington ignores the fact that defense counsel was afforded an opportunity to interview Dr. McCormick prior to trial and examine every report and photograph that he had. Dr. McCormick, not the State, had these photographs in his possession. Indeed, the record reveals that Dr. McCormick offered to confer with any pathologist employed by the defense. And, the defense had unlimited access to, and did in fact interview Dr. McCormick. There is no suggestion in the record that Dr. McCormick concealed any report or photograph from defense counsel. All this prospective evidence was available to them upon request from Dr. McCormick at his laboratory. Furthermore, when the photographs were offered into evidence, defense counsel made no motion for a recess in order to determine whether or not they had been harmed in any way by not seeing the photographs prior to trial. Jones v. State, supra. Defense counsel had an opportunity to have their own forensic pathologist, *977 Dr. Walters, examine the photographs, and if Dr. Walters had any difference of opinion from Dr. McCormick as to what the photographs revealed, to express it on the witness stand.

YOU DO NOT HAVE TO KNOW INSTRUCTION
The State was granted the following instruction:
JURY INSTRUCTION NO. S-3
The Court instructs the jury that you do not have to actually know that the defendant is guilty before you can convict him; but that it is only necessary that you should find from the evidence in this case beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis that he is guilty; and if you do find from all the evidence in this case, beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis than guilt that the defendant is guilty, it is your sworn duty to find him guilty as charged.
Whittington made no objection to this instruction at the time it was granted, and now, for the first time on appeal, he claims it was erroneous. It is well settled that no error can be assigned as to any jury instruction to which no objection was interposed when it was granted in the circuit court. Watson v. State, 483 So.2d 1326 (Miss. 1986); Gray v. State, 472 So.2d 409 (Miss. 1985); Hines v. State, 472 So.2d 386 (Miss. 1985); Billiot v. State, 454 So.2d 445 (Miss. 1984). Moreover, as on several other of his assignments of error, he fails to cite authority. We nevertheless make some observations for this Court.
In Miller v. State, 35 So. 690 (Miss. 1904), we found nothing wrong with the following instruction to the jury:
The court instructs the jury that while it is true that it devolves upon the state to show the defendant guilty to your satisfaction beyond a reasonable doubt, that this does not mean that you must know that the defendant is guilty, but if, after a full and fair comparison of all the evidence in the case, if you conscientiously believe beyond a reasonable doubt that he is guilty, then you should so find.
This instruction has an interesting history. In Sauer v. State, 166 Miss. 507, 144 So. 225 (1932), a circumstantial evidence case, the jury was instructed that they did not have to actually know that Mrs. Sauer was guilty before they could convict her, but that it would only be necessary that they believe from all the evidence beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis than that of guilt, that she was guilty. As to this instruction, we stated:
It is always true that the jury are not required to know facts absolutely. They must believe from the evidence, and their belief must arise from evidence, or the want of evidence, and the jury must not use anything except that which is offered in evidence. The latter part of the instruction clearly informed the jury that they are only required to believe, from the evidence, beyond all reasonable doubt, and to the exclusion of every other reasonable hypothesis, that the defendant was guilty.
Applying the rule as to the sufficiency of circumstantial evidence, it must be a reasonable hypothesis. Circumstantial evidence does not have to exclude every possible doubt, but only every reasonable doubt, or reasonable hypothesis. To exclude every reasonable hypothesis is a somewhat stronger expression than excluding every reasonable doubt.
166 Miss. at 523-24, 114 So. at 229-30.
In Allgood v. State, 173 Miss. 27, 161 So. 756 (1935), we observed as to this type of instruction:
[W]e have uniformly refused to reverse for the giving of this instruction. In fact, the jury are not required to know that any person is guilty, but are to believe from the evidence, beyond a reasonable doubt, that he is guilty. Knowledge is not always attainable, and usually a juror having knowledge of the facts of the case, if this be disclosed, will be deemed incompetent. The jury are supposed to go into the jury box with an *978 open mind, and a disposition to do justice according to the evidence.
173 Miss. at 33, 161 So. at 758.
We also addressed challenges to the instruction in Walton v. State, 212 Miss. 270, 54 So.2d 391 (1951); Bolin v. State, 209 Miss. 866, 48 So.2d 581 (1950); Sanders v. State, 192 So. 344 (Miss. 1939). We perceived no error in granting the instruction in these cases.
In Collins v. State, 202 So.2d 644 (Miss. 1967), Justice Inzer, speaking for the Court, held:
There is no merit in the assignment of error relative to instruction number 1 granted the State. This instruction is similar to others that have been specifically approved many times by this Court, and is to the effect that the jury does not have to actually know that the defendant is guilty in order to convict, but may convict if the jury believes him guilty from all the evidence in the case beyond a reasonable doubt.
202 So.2d at 646.
The first hint of unease by this Court with the instruction was in Carroll v. State, 215 So.2d 871 (Miss. 1968), when Justice L.A. Smith, Jr., speaking for the Court, noted:
While the instruction contains a correct statement of an abstract principle of law, we think it falls within that class of instructions which it would be better not to give but which, in themselves, do not constitute reversible error. The evidence of guilt is this case was ample and we find no reversible error in the record.
215 So.2d at 872.
In Byrd v. State, 228 So.2d 874 (Miss. 1969), Justice R.L. Jones, speaking for the Court, held:
The State was granted an instruction that the jury did not have to know that the defendant was guilty. This instruction has been criticized, but has not been held reversible error. (citation omitted)
228 So.2d at 887.
Thereafter, in McGill v. State, 235 So.2d 451 (Miss. 1970), Justice Stokes V. Robertson, Jr., speaking for the Court, and citing Carroll v. State, supra, held the instruction should not be given, and concluded with the following admonition:

Carroll was not a close case; neither is this case, but in a close case such an instruction might constitute the difference between an affirmance and a reversal. We strongly urge district attorneys not to ask for this instruction, and judges not to grant it. A word to the wise should be sufficient.
235 So.2d at 452.
Then, in Pieratt v. State, 235 So.2d 923 (Miss. 1970), Justice Gillespie, speaking for the Court, held:
A number of cases declare that this instruction should not be given and again we repeat this unheeded admonition. However, this court has also held that the instruction does not constitute reversible error.
235 So.2d at 925.
In Pryor v. State, 239 So.2d 911 (Miss. 1970), Justice Rodgers, for the Court, held:
This Court has condemned this instruction many times, (citations omitted), but the State has continued to use it, and finally, in an effort to stamp out this unfair practice, we have decided to require a new trial in this case because this instruction was used.
The case now before the Court is a good example of the unfairness of this instruction since it is now being used in a circumstantial evidence case.
The case must be reversed because of the foregoing instruction....
239 So.2d at 912.
It should be noted in the above case that the case was reversed and rendered because of insufficient evidence.
In Spencer v. State, 240 So.2d 260, 263 (Miss. 1970), reversed on other grounds as well, Justice Brady, for the Court, held it was reversible error to give this instruction. In Pitts v. State, 241 So.2d 668, 671 (Miss. 1970), this Court held that such an instruction in a circumstantial evidence case "especially unfair" and granting it constituted "fatal error."
*979 In Nobles v. State, 241 So.2d 826 (Miss. 1970), Justice Rodgers, for the Court, stated:
Again, we are called upon to say whether we will permit this dangerous instruction to continue to darken our judicial heritage of fair play. Our answer is that this instruction must not be used in the future....
* * * * * *
It might be well to pause here and point out that instructions generally are not to be used to make out a criminal case. The factual case must be established by the evidence and not by instructions. The instructions are to explain to the jury the law; they are not to be added to the evidence as a part of the factual issue.
241 So.2d at 827-828.
In Jones v. State, 241 So.2d 829 (Miss. 1970), the instruction was condemned. Finally, in Murphy v. State, 246 So.2d 920, 922 (Miss. 1971), Justice Rodgers, for this Court, condemned the instruction as being unfair in all cases, and especially so in circumstantial evidence cases.
Beginning with Nobles v. State, supra, this Court held that in all cases tried subsequently to September 28, 1970, the date of the Pryor case decision, in which the instruction was given, that this would constitute reversible error.
In Gilleylen v. State, 255 So.2d 661 (Miss. 1971), the Court, while reversing primarily for other reasons, quoted the instruction and cited cases to support reversal, even though the case was tried before Pryor.
In this case we note that the circuit judge in granting the instruction deleted the word "believe" as it twice appeared and inserted "find." We also note from all the remaining instructions that unquestionably the jury was fully and amply instructed on the law and evidence in this case. Furthermore, with the possible exception of this instruction, the jury was correctly instructed as to the law pertaining to this case.
There likewise can be no question but that the State in its argument to the jury would be free to argue precisely what this instruction states. As we observed in Allgood v. State, supra, if a member of the jury had knowledge of the facts, he could not serve as a juror. Because they were not eyewitnesses, a jury could indeed never know with that absolute certainty of the eyewitness whether a defendant was guilty or not guilty. The law obviously does not require the jury to know with that certainty in order to authorize a jury to convict. As a statement of the mental condition each juror must have in order to return a guilty verdict, the instruction, as was held in Carroll v. State, supra, correctly states the law.
In order to return a verdict of guilty, each juror must be convinced beyond all reasonable doubt that an accused is guilty. While the law requires this absolutely, it does not require more.
Unfortunately, the series of cases condemning the instruction failed to set forth the reasons why it should never be given. Does it minimize the burden of proof which the State has in every criminal case? Is the circuit judge commenting upon the weight of the evidence? Is it an attempt to amplify the plain words "believed beyond a reasonable doubt"? The decisions do not tell us.
Whittington's only fault with the instruction is that each juror in his own mind should indeed subjectively "know" the defendant was guilty in order to warrant a conviction. This manifestly is not the law.
At the conclusion of this particular assignment of error, the defense brief contains the following paragraph:
If such phraseology must be included in a court's instructions, the better wording would be to the effect that in order to find a defendant guilty, each juror must know beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence that the defendant is guilty.
As can be seen, the instruction states this precisely.
Under our scope of appellate review we are only required to determine whether reversible *980 error was committed by the circuit court in granting the instruction. We do not place our stamp of approval on it, and it certainly was not a necessary instruction for the State. Neither can we hold that the jury was misled by this instruction, even had there been an objection, and therefore hold that no reversible error was committed in granting it.

FINE IMPOSITION
Miss. Code Ann. § 99-19-32 (1972) reads as follows:
§ 99-19-32. Fines and assessments upon persons convicted of offenses punishable by imprisonment for more than one year; deposit of Criminal Justice Fund.
(1) Offenses punishable by imprisonment in the State Penitentiary for more than one (1) year and for which no fine is provided elsewhere by statute may be punishable by a fine not in excess of Ten Thousand Dollars ($10,000.00). Such fine, if imposed, may be in addition to imprisonment or any other punishment or penalty authorized by law.
(2) In addition to any fine imposed by the court under this section, there shall be imposed and collected an assessment, in an amount equal to the fine imposed, from each person upon whom the court imposes a fine. Each such assessment shall be paid to the court in which such fine is imposed, and all such assessments shall be forwarded to the State Treasurer on the day when the funds are credited to the treasury of the county, in accordance with Section 7-9-21. The State Treasurer shall then deposit such funds in a special fund hereby created in the State Treasurey to be designated the "Criminal Justice Fund." The Legislature may make appropriations from the Criminal Justice Fund for the purpose of defraying such costs as the state incurs in the administration of the criminal justice system of this state. [Emphasis added]
On January 31, 1986, pursuant to the above statute, the trial judge sentenced Whittington to serve a term of life imprisonment in the Mississippi Department of Corrections and to pay a fine of $4,000 and all costs. Then on February 3, 1986, the circuit clerk of Franklin County also pursuant to the above statute added a $4,000 assessment. Whittington contends that this statute violates his constitutional rights to due process. Whittington, however, was given a trial on the merits and was found guilty and pursuant to § 99-19-32 was fined $4,000 and assessed an amount equal to the fine imposed, all as authorized by statute.
AFFIRMED.
ROY NOBLE LEE, C.J., and PRATHER, ANDERSON and GRIFFIN, JJ., concur.
DAN M. LEE, P.J., and SULLIVAN, J., dissent.
ROBERTSON and ZUCCARO, JJ., concur in affirmance with separate written opinion and join DAN M. LEE'S dissent as to Part I.
DAN M. LEE, Presiding Justice, dissenting:
I respectfully dissent from the majority's opinion for two reasons. First, while I might agree that Whittington is procedurally barred from assigning as error the giving of the "you do not have to know" jury instruction because he failed to object to it at trial, the majority's further observations about that instruction I cannot agree with. Second, the opinion testimony of Officer Chandler that Mrs. Whittington "was not killed in the wreck" was not harmless error; rather, such testimony constitutes reversible error and, therefore, the case should be remanded for a new trial.

I.

"You Do Not Have to Know" Instruction
In its "observations" which, I point out, are unnecessary to dispose of this assignment of error, the majority opinion takes great pains to set out the historical analysis of this jury instruction, which states in part:

*981 The Court instructs the jury that you do not have to actually know that the defendant is guilty before you can convict him; but that it is only necessary that you should find from the evidence in this case beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis that he is guilty ...
From 1904 to 1967, this Court perceived no reversible error in giving this instruction. See Collins v. State, 202 So.2d 644 (Miss. 1967); Walton v. State, 212 Miss. 270, 54 So.2d 391 (1951); Bolin v. State, 209 Miss. 866, 48 So.2d 581 (1950); Sanders v. State, 192 So. 344 (Miss. 1939); Allgood v. State, 173 Miss. 27, 161 So. 756 (1935); Sauer v. State, 166 Miss. 507, 144 So. 225 (1932); Miller v. State, 35 So. 690 (Miss. 1904). However, as the majority acknowledges, this Court became uncomfortable with this instruction, beginning with Carroll v. State, 215 So.2d 871 (Miss. 1968), and ending with Nobles v. State, 241 So.2d 826 (Miss. 1970), Pryor v. State, 239 So.2d 911 (Miss. 1970); and Murphy v. State, 246 So.2d 920 (Miss. 1971), where the instruction was condemned as being unfair in all cases, especially in circumstantial evidence cases, and where this Court found it reversible error to give the instruction. Today, in our first confrontation with this instruction since Murphy (evidently, the prosecutor and the trial judge forgot about Nobles, Pryor and Murphy), the majority overrules Nobles, Pryor and Murphy, apparently because the cases condemning the instruction "failed to set forth the reasons why it should never be given." To the contrary, the cases explain exactly why the instruction is unfair and why it constitutes reversible error to give the instruction.
Beginning with Carroll v. State, 215 So.2d at 872, this Court acknowledged that the instruction contains a "correct statement of an abstract principle of law," but it was better not to give it, impliedly because it did not adequately convey, in an understandable fashion, the "abstract" principle that jurors must believe beyond a reasonable doubt from the evidence that a defendant is guilty of the crime charged. In McGill v. State, 235 So.2d at 452, this Court strongly urged that the instruction not be given because in a close case, the instruction "might constitute the difference between an affirmance and a reversal." In other words, in a close case, this instruction tells the jurors that if they think the defendant might have committed the crime as charged, it is all right to find him guilty. The state's burden of proof is thus diminished from "beyond a reasonable doubt" to something less. Finally, in Pryor v. State, 239 So.2d at 912, this Court made it reversible error to give this instruction because it is an unfair instruction in close cases  specifically, in circumstantial evidence cases which by their very nature are close cases factually. Such an instruction allows the state to supply by instruction what it is not able to supply by evidence, thereby diminishing its burden of proof. Our opinion in Nobles v. State, 241 So.2d at 828, succinctly states the point:
[I]nstructions generally are not to be used to make out a criminal case. The factual case must be established by the evidence and not by instructions. The instructions are to explain to the jury the law; they are not to be added to the evidence as a part of the factual issue.
Obviously, this opinion states the reason the instruction must not be given; it diminishes the state's burden of proof in a criminal case.
The majority opinion gives no good reason to overrule our decisions in Nobles, Pryor and Murphy, except to say that it cannot perceive how a jury in this case could be misled by the instruction. Closer analysis of the situation, however, shows plainly why the jury could have been misled. In the first place, the case is a close one factually. The state and Whittington both put on credible evidence as to their respective versions of the incident. The evidence against Whittington is circumstantial. To tell the jurors that, on the one hand they must find from the evidence beyond a reasonable doubt and to the exclusion of every other hypothesis that the defendant is guilty, but on the other hand the jurors do not have to actually know the defendant is guilty, sends mixed messages to jurors about what their duty is. In the *982 abstract, it is not the jurors' duty to actually know; in reality, however, they must find a defendant guilty beyond a reasonable doubt. The distinction between the two concepts lies in the legal principle that the jurors must find the defendant guilty beyond a reasonable doubt based on the evidence before them at trial. The instruction does not make this legal distinction clear to jurors who are not versed in legal niceties of distinction. The danger of the instruction lies in the possibility that jurors may focus on what the evidence does not have to show them rather than on what the evidence actually shows. If they do not have to "know" the defendant is guilty, then if there is some evidence to convince them the defendant might be guilty, they can find him guilty, even though the evidence might not rise to the level of "beyond a reasonable doubt." This is the danger this Court saw in the instruction way back in our Carroll opinion and this is the danger this Court sought to stamp out in Pryor, Nobles and Murphy. The danger still exists, and the reasons for expunging the danger from our courts remains valid, even some 17 years from the first time this Court declared it reversible error to give this instruction. I would not overrule Pryor, Nobles and Murphy. Indeed, there is no reason for this Court to even discuss this instruction further, since Whittington is procedurally barred from bringing the error before it, except to reiterate that where there is no procedural bar this Court will continue to find use of the instruction reversible error.

II.

Officer Chandler's Opinion Testimony
The majority opinion correctly analyzes why Officer Chandler's opinion testimony that Mrs. Whittington was not "killed in the wreck" was objectionable. Chandler was not shown to have any special qualifications to express such an opinion as an expert; likewise, even as an expert, he gave no basis for his opinion. Furthermore, Chandler's opinion does not meet the criteria set out in M.R.E. 701. His opinion that Mrs. Whittington was not killed in the accident was not based on his firsthand knowledge or observation  it was merely a conjecture on his part as he viewed the scene of the accident. The opinion was not helpful to the jury in understanding the issue in the case. It merely told the jury how the case should be decided, thereby shifting responsibility for decision from the jury to the witness. See Owen v. Kerr-McGee Corporation, 698 F.2d 236, 240 (5th Cir.1983) (testimony which allows witnesses to tell the jury what result to reach is not admissible); United States v. Phillips, 600 F.2d 535, 538 (5th Cir.1979) (dicta suggesting that opinion testimony which "chooses up sides" is inadmissible); see also McCormick on Evidence, §§ 11, 12 (E. Cleary, 3rd Ed. 1984).
Allowing such a shifting of the jury's responsibility cannot be deemed harmless error. In the first place, such conclusion was not "obvious" and "inescapable" as was the case in Askin v. State, 178 Ga. App. 810, 344 S.E.2d 699, 700 (1986), cited by the majority. In the second place, it cannot be harmless error where, as here, an officer of the law sits on the stand in his uniform and offers his conjecture as to how Mrs. Whittington died. Such a witness is undeniably a very influential witness, and the defendant had no witness equally as influential to place on the stand to rebut such a conjecture. The majority opinion begs the question when it finds Chandler's opinion testimony harmless error because his testimony was followed by that of Dr. McCormick who offered, from an expert's standpoint, the opinion that Mrs. Whittington was not killed in the automobile accident. Whittington was also able to offer the expert testimony of a forensic pathologist that Mrs. Whittington died in the automobile accident. The point remains, however, that Whittington would never be able to produce the kind of influential witness as was Officer Chandler to rebut his conjecture that she did not die from the accident. In effect, after Chandler's opinion testimony, the burden of proof shifted from the state to prove that Mrs. Whittington did not die in the accident, to Mr. Whittington to prove that she did. See United States v. Bass, 425 F.2d 161, 164 (7th Cir.1970).
*983 The prejudice to the defendant by allowing such opinion testimony was not cured, nor was it curable. Therefore, this case should be reversed and remanded with instructions that Officer Chandler not be allowed to testify at re-trial as to his highly conjectural statement that Mrs. Whittington was not "killed in the accident."
ROBERTSON, Justice, concurring:
I remain of the view that the quantum and quality of proof required for conviction in all criminal cases is proof beyond a reasonable doubt. Circumstantial evidence cases such as today's are no exception.
I have never understood the logic or common sense of the so-called circumstantial evidence instruction. It is a highfalutin redundancy. If an accused's guilt is established to the exclusion of every reasonable hypothesis consistent with innocence, then he has been shown guilty beyond a reasonable doubt. Conversely, if the evidence has not excluded from the juror's mind a reasonable hypothesis consistent with innocence, the accused has not been proved guilty beyond a reasonable doubt.
I have developed the point in my separate opinions in Montgomery v. State, 515 So.2d 845, 849-52 (Miss. 1987) (Robertson, J., concurring); Mack v. State, 481 So.2d 793, 796-97 (Miss. 1985) (Robertson, J., concurring); and with citation of authority. I will repeat only my challenge that a case be presented  real or imagined  in which one may say with confidence that the evidence at once (a) proves the defendant guilty beyond a reasonable doubt but (b) fails to exclude every reasonable hypothesis consistent with innocence.
Applying the standard that ought be applied, affirmance is required. I disagree with so much of the majority opinion as is inconsistent herewith and with what I have said in Montgomery and Mack. Beyond this, I join Part I of the separate opinion filed by Presiding Justice Dan M. Lee. Otherwise, I concur in the opinion of the Court and, more specifically, today's judgment of affirmance.
ZUCCARO, J., joins in this opinion.